**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
CHRISTOPHER RUSTICI,

                              Petitioner,

                    -against-

WILLIAM PHILIPS, SUPERINTENDENT,
GREENHAVEN CORRECTIONAL FACILITY,

                           Respondent.
-------------------------------------------------------X

<u>**MEMORANDUM OF**</u>
<u>**DECISION AND ORDER**</u>
04 CV 2856 (ADS)

<u>**APPEARANCES**</u>**:**

**LAW OFFICES OF THOMAS F. LIOTTI**
Attorney for the Petitioner
600 Old Country Road, Suite 530
Garden City, New York 11530
        By:    Thomas F. Liotti, Esq., of Counsel

**KATHLEEN M. RICE, DISTRICT ATTORNEY**
**COUNTY OF NASSAU**
Attorney for the Respondent
262 Old Country Road
Mineola, New York 11501
        By:    Margaret E. Mainusch, Assistant District Attorney

**SPATT, District J.**

        Christopher Rustici ("Rustici" or the "petitioner") petitions this Court for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court regrets that this habeas

petition, which was filed in 2004, is only being determined at this time. However, the

resolution of this matter was delayed, in part, by the petitioner's counsel, who has

submitted almost two hundred pages of briefing, including six supplemental briefs.

The Court notes that most recent supplement brief was filed on March 15, 2007. For the reasons that follow, the petition is denied.

## I.     BACKGROUND

### A.     Procedural History

The petitioner seeks to vacate a January 26, 2000 judgment of conviction and February 29, 2000 sentence, which were entered after a jury convicted him of one count of Murder in the Second Degree based on a theory of depraved indifference; one count of Criminal Possession of a Weapon in the Second Degree; and one count of Criminal Possession of a Weapon in the Third Degree. The charges arose out of the shooting death of Paul Behr ("Behr") in 1997. At his trial in state court, the petitioner admitted shooting Behr, but claimed that the gun discharged accidentally.

On February 29, 2000, the Honorable Donald E. Belfi of the County Court for the County of Nassau sentenced the petitioner to a term of imprisonment of twenty-five years to life under the murder count; seven and one-half to fifteen years under the second degree weapon possession count, to run concurrent to the murder count; and three and one-half to seven years under the third degree weapon possession count, to run consecutively to the other counts. The New York Supreme Court, Appellate Division, Second Department, affirmed the conviction, People v. Rustici, 303 A.D.2d 606, 756 N.Y.S.2d 498 (2d Dep't 2003), and the New York Court of Appeals denied leave to appeal, People v. Rustici, 100 N.Y.2d 586, 796 N.E.2d 489, 764 N.Y.S.2d

397 (2003).  Also, on September 21, 2001, Judge Belfi denied the petitioner's motion to vacate his judgment of conviction pursuant to Section 440 of New York's Criminal Procedure Law.

On July 7, 2004, Rustici filed this petition, raising eight arguments in support of habeas corpus relief:

> Ground One:   The Petitioner suffers from a severe personality disorder—Dependent Personality Disorder, which prevented him from understanding the nature and consequences of his actions at the time of the incident.  However, because petitioner was unable to offer psychological expert testimony, petitioner received an unfair trial.  If the expert testimony was allowed, the jurors would have found petitioner not guilty.

> Ground Two:  The Petitioner's statements to law enforcement were not made knowingly, voluntarily and intelligently.  Due to his severe personality disorder, the Petitioner would have admitted to anything. He was compliant and looking for approval and acceptance from any father or authoritarian figure.  The Petitioner was therefore deprived of his right to remain silent in violation of the Fifth Amendment of the United States Constitution.

> Ground Three: The presentation of this psychological evidence at trial would enable petitioner to be found not guilty by reason of insanity or guilty of a lesser charge due to extreme emotional disturbance and diminished capacity or to be found not guilty.

> Ground Four:  The Petitioner's C.P.L. § 440 Motion to vacate his judgment of conviction and ordering a new trial based upon the aforementioned newly discovered evidence [of a severe personality disorder] should have been granted.  The trial court erred in not ordering an evidentiary hearing on the basis of the new evidence submitted to support it in support of petitioner's 440 motion.

> Ground Five: The Petitioner received an illegal consecutive sentence. The Court could have imposed a sentence of 15 years to life but

instead imposed a maximum sentence thusly [punishing] the Petitioner for exercising his right to go to trial. The Petitioner had been offered in plea bargains a determinate sentence of 12 years on a manslaughter first degree plea.

Ground Six: The Court erred in not charging the jury on accident or mistake of fact. Again, this coupled with the Petitioner's psychological diagnosis would have caused the Petitioner to either be acquitted or convicted of a lesser charge. The Court also confused the jury on its charging instructions by the preclusion of the lesser included offenses and failing to into account the law in People v. Sanchez, 98 N.Y.2d 373 and Jones v. Keane, 82 Civ. 1804 (CLB). Both cases were decided after the Rustici trial but both addressed the conflated and confusing nature of the homicide law in New York which have recently undergone some changes in jury instructions in light of the New York Court of Appeals decision last year in People v. Hafeez, [100 N.Y.2d 253, 792 N.E.2d 1060] (2003).

Ground Seven: The prosecution committed gross misconduct in disregarding motions *in limine*.

Ground Eight: New York's Statutory distinction between reckless manslaughter and depraved indifference murder, as interpreted by the New York Court of Appeals violates the rights to Due Process and Equal Protection. The U.S. Court of Appeal for the Second Circuit in St. Helen v. Senkowski, Docket No. 03-2777 is currently considering whether the standard used to distinguish between reckless manslaughter and depraved indifference murder is violative of a defendant's Due Process and Equal Protection rights under the Constitution of the United States and the Constitution of the State of New York. . . .

(Petition, dated July 7, 2004.)

In addition to these grounds that are specifically enumerated in the

petition, the petitioner also raises several additional grounds for relief in the text

of his memoranda submitted in support of his petition. These grounds are that

(1) there was insufficient evidence introduced at trial to support the petitioner's conviction of Second Degree Murder on a theory of depraved indifference; and (2) the trial judge improperly limited the defense's cross-examination of a witness in violation of the Confrontation Clause of the Sixth Amendment the Constitution.

**B.    Facts**

Testimony at the petitioner's trial established that on August 22, 1997, at approximately 5:00 p.m., a thirteen year old boy named Ralph Mandarino was in his house in Syosset when he and a friend heard a "loud noise" from outside.  It sounded "[l]ike a car backfiring, or a firecracker."  Mandarino and his friend rode their bikes around the block and discovered a neighbor, Paul Behr, lying on his front lawn, on his back, in pain and bleeding.  Behr was asking for help.  The Nassau County Police were called, and Behr was taken to a hospital where he died from a single gunshot wound.  On November 13, 1997, Christopher Rustici was taken into custody in connection with the Behr shooting.  The petitioner confessed to shooting Behr, but claimed that the gun discharged accidentally. (Tr. at 56.)[*]

---

[*]References to "Tr." refer to the transcript of the trial testimony and proceedings.

### 1. The Trial Testimony of Christopher Rustici

At his trial, the petitioner testified that he was twenty-three years old in August, 1997.  The petitioner was raised in Huntington, New York and spent most of his life there.  In or about January, 1997 the petitioner "went to Florida to do some work" and to help a friend move into a new house.  The petitioner stayed in Florida for approximately five months working in a "detailing shop" where he cleaned cars.  (Tr. at 300-01, 305-07.)  He then returned to New York.

At some point during the summer of 1997, the petitioner was introduced to a man named Antonio Bertolini.  The petitioner and Bertolini became social acquaintances, sometimes going "jet-skiing" together.  In or about the end of the month of July in 1997, Bertolini approached the petitioner asking if he would help "beat a guy up" who owed a friend money.  The petitioner agreed, although he didn't "think it was serious."  (Tr. at 308-11.)

On August 22, 1997, Bertolini picked the petitioner up at his house.  As the two drove off, the petitioner did not know where they were going.  At some point, Bertolini showed the petitioner a picture of a white male.  Bertolini identified the person in the picture only as someone who owed a friend money. The petitioner had never seen this person before, and Bertolini did not tell the petitioner the man's name.  (Tr. at 315-17.)

Bertolini drove the petitioner to the victim Behr's neighborhood in Syosset, New York, and identified Behr's house. Bertolini realized that Behr was not at home, so the two went to a pizza restaurant in the neighborhood. After eating pizza, the two returned to Bertolini's car and left the parking lot. As they were leaving the parking lot of the pizzeria, Bertolini pulled a white towel or T-shirt from under the seat, and placed it on the seat of the car. The petitioner asked what the towel or shirt was, and Bertolini revealed that it was wrapped around a revolver. Bertolini commented that "this would be easier . . . than beating him up." (Tr. at 317-21.)

Bertolini drove the petitioner back to Behr's neighborhood. This time, as they drove past Behr's house, Bertolini said that Behr was home. Bertolini drove around the corner, said to the petitioner that he would wait there, and told the petitioner "to go do it." The petitioner took the gun, put it in his pocket, and left the car. The petitioner testified that at that point, "[t]here was no way I was going to shoot him. I didn't have a plan." He got out of the car with the gun because Bertolini kept telling him to get out of the car, to "go do it." The petitioner just wanted to get away from Bertolini. (Tr. at 322, 325-26.)

After leaving the car, the petitioner walked past Behr's house, and then back in the direction of Bertiolini's car. As the petitioner walked back to the car, Bertolini drove past him, pointing in the other direction saying "He's there. He's

there.  Go, go."  The petitioner looked and saw a man standing on his front lawn.

The petitioner could not see the man's face.  At that point, the petitioner "was

scared," and he didn't want to do it.  However, the petitioner did not return to the

car because he did not want Bertolini to think that he was "a wimp or anything."

The petitioner was "trying to be tough guy."  (Tr. at 326-28.)

The petitioner testified that at first, he "stood by [a] bush thinking of how

[he] could get [himself] out of this."  He thought that maybe he could just scare

Behr.  The petitioner crossed the street and walked toward Behr's house.  As he

approached Behr's house, he was "in a slow jog."  As he jogged, the petitioner

held the gun at his side, pointed at the ground.  When the petitioner reached the

plaintiff's driveway, he "slipped."  The petitioner attributes his fall to "gravel" or

"loose stones."  When he slipped, his arms "went out to break [his] fall," and the

gun fired.  (Tr. at 329, 335.)

After the gun discharged, the petitioner saw Behr grab his right side, in the

area of his right kidney.  The petitioner ran back to Bertolini's car and jumped in

through the passenger window, the gun still in his hand.  The petitioner told

Bertolini to take him home.  There was no conversation along the way, nor was

there any conversation when the petitioner got out of the car.  At approximately

6:30 or 7:00 that evening, Bertolini called the petitioner and told him that Behr

was dead. The petitioner testified that he became sick to his stomach, vomited, and sat in the bathroom crying. (Tr. at 336-338, 340.)

At a later date, approximately one week after the shooting, the petitioner spoke with a man named Artie Givargidze ("Givargidze"), who told the petitioner that Bertolini "told him everything." The petitioner responded that "it was an accident." One week after that conversation, the petitioner again spoke with Givargidze about the shooting. According to the petitioner, Givargidze approached him and asked how it happened. The petitioner "just said, -- um: Yeah, the guy looked at me, so I shot him." But this was not the truth. (Tr. at 345.) The petitioner was again "[t]rying to be a tough guy." (Tr. at 342-45.)

Later during his testimony, the petitioner testified that when he got out of the car in Syosset his intention was to scare Behr. He had no intention of firing the gun in Behr's direction when the weapon discharged. (Tr. at 349.)

On cross-examination, the petitioner admitted that he told Detective Martin Alger of the Nassau County Police ("Detective Alger") that he went to Behr's house to "beat him up"; that he was going to do it with a bat; that Bertolini said that he should break Behr's knees; that Bertolini offered him $2,000 to carry out the assault; and that he knew Bertolini carried a bat in his car because he had seen it previously. (Tr. at 353-66.) The petitioner also admitted that as he

approached Behr's house his finger was on the trigger of the gun; the gun was

loaded; and that he pulled the trigger.

> Q.     And when you walked, or approached Mr. Behr's house, when you got to the bush you said that you decided then you were going to scare him?
>
> A.     Yes.
>
> Q.     And then you took the gun out of your pocket?
>
> A.     As I was walking towards the house.
>
> Q.     All right [sic], and put your finger on the trigger?
>
> A.     Yes, put my finger on the trigger.
>
> Q.     So, and you said before that the gun discharged, you fired the gun?
>
> A.     Yes.
>
> Q.     It didn't discharge by itself; did it?
>
> A.     No.

(Tr. at 366-67.)

Upon further cross-examination, the petitioner testified that as he

approached the house, Behr was kneeling on the grass, picking weeds.  After the

gun fired, the petitioner did not attempt to render aid to Behr; he did not know

whether Behr was alive or dead; and that he did not tell anyone else since the

shooting that he only intended to scare Behr.  (Tr. at 372, 374-78.)

The petitioner also testified about his arrest, interrogation, and the statements that he made to the police and the District Attorney's office. On November 13, 1997, the petitioner was taken into custody. The petitioner remained silent while handcuffed and being transported to the police station. At the police station, he was held in an interrogation room for "twenty minutes, maybe longer" before he "broke down" because he "was upset" and "scared." (Tr. at 347-48.)

During the police interrogation, the petitioner told the interviewing detective that the shooting was an accident. In response to cross-examination, the petitioner testified that he recognized the rights card that Detective Alger used to advise him of his <u>Miranda</u> warnings when it was presented to him. The <u>Miranda</u> rights were given to him prior to questioning, and he told the detective that he understood those rights and that he was willing to answer questions without an attorney present. The petitioner testified that he gave a written statement to Detective Alger, and that he gave the statement voluntarily. The petitioner was with Detective Alger for approximately twenty minutes before he began telling him what happened regarding the shooting. The police did not "have him in there for hours on end before he began telling them about what happened." He told Detective Alger the truth. He also voluntarily gave a videotaped statement to an Assistant District Attorney. (Tr. at 349-50, 358-59.)

### 2. The Trial Testimony of Arturo Givargidze

Givargidze was an acquaintance of the petitioner. The two had met in March of 1997, and would see each other frequently when, among other times, the petitioner would visit Givargidze's Carvel ice-cream store as a customer. Givargidze and the petitioner had a conversation about the Behr shooting.

> Q     And what if anything did you say to [the petitioner], and what if anything did [the petitioner] say in response to you?
>
> A     I asked him why he would get involved with a shooting.
>
> Q     And what did he say?
>
> A     He told me that he shot the guy, and went on to describe how it took place.
>
> Q     All right [sic], can you tell the jurors what it was he told you transpired.
>
> A     He told me that Anthony Bertolini took him up to this house in Syosset. They drove around the house a couple of times. And Anthony Bertolini showed him the house, parked on the corner.
>
>        He got out of the car, walked up to the house. And as he was walking up there, he had a baseball cap on, and he put it over his eyes. As he was walking up there, the guy was doing gardening work.
>
>        As he was ten feet away from him, and about to jump him, the guy turned around and saw his face. He shot him. And then he ran back to the car where Bertolini was waiting on the corner.

(Tr. at 146-50.)

### 3. The Trial Testimony of Detective Martin Alger

On the morning of November 13, 1997, Detective Alger was assisting another detective, Detective Joseph Volpe, with a homicide investigation. Detective Alger met the petitioner at approximately 9:25 a.m. that morning, in an interview room at Nassau County Police headquarters in Mineola, New York. At that time, the petitioner was handcuffed to a wooden chair. (Tr. at 216-18.)

Detective Alger entered the interview room with Detective Volpe and uncuffed the petitioner. Detective Alger questioned the petitioner about his background and what he did for a living. Detective Alger indicated to the petitioner that he would like to ask him questions about an incident involving a shooting in Syosset, but that he would first read to him his <u>Miranda</u> rights. Detective Alger read from a form called "PDCN Form 233," which contained the <u>Miranda</u> warning. The petitioner confirmed that he understood his rights as they were read to him, and stated that he was willing to talk and answer questions without a lawyer present. (Tr. at 218, 220-23.)

> A:      . . . I asked him: Chris, do you understand what I just read to you?
>
> And he said: Yes.
>
> I said: Now that you understand, are you willing to answer questions before talking with a lawyer or having one present?
>
> And his response to me again was: Yes, but I don't know if I can help you. But yeah, I'll talk to you.

(Tr. at 223.)  Detective Alger then showed the Form 233 to the petitioner for him to review, and the petitioner wrote "yes" on the form next to where it asked whether the suspect understood his rights and was willing to answer questions without a lawyer.  The petitioner also signed the form.  (Tr. at 224.)

Detective Alger told the petitioner that they had obtained statements about the Behr shooting from Bertolini and Givargidze, and Bertolini told the police that the petitioner "pulled the trigger on it," and that he wanted to know "exactly what [the petitioner] did on it."  Detective Alger emphasized his remarks to the petitioner by pointing his finger at him.  After being confronted with this information, the petitioner began to cry.  (Tr. at 229-30.)

The petitioner then confessed to the shooting by telling Detective Alger that it was an accident.

> A:      I said: An accident?
>
> He says: It was an accident, he says, I was jogging up towards him, and he says and as I got near or close to him, he says, I tripped, and he says, and the gun went off.  And he says, and he grabbed his side.  And he says it was an accident.  He says, you got to understand, he says, it wasn't supposed to happen like that.  He wasn't supposed to die.

(Tr. at 231-32.)

The petitioner then provided additional factual details for Detectives Alger and Volpe.  Detective Alger testified:

A:    He says: I went -- there was a bush by the corner on the street corner, he said. Bertolini had left, and there is a bush there, and he says I'm standing behind the bush, and I'm thinking to myself: How an I going to do this? And he says: I'm thinking. And he says: And then I just took off and I started off in a walk, fast walk, into a trot, into a jog. And he says: I'm coming there near him. He says: He is on the front lawn, bent over, with his back towards me. He is bent over working on the lawn, doing something on the lawn.

And he says: As I'm running towards him now, and I get up near the driveway, he says, and I'm coming towards him, right now I put my hand in my pocket. And as I'm running, I'm taking the gun out. And I now have the gun in my right hand, and my finger is on the, in the trigger part, on the trigger.

And as I'm nearing him, he says, at that point he says, I trip.

I asked him, on what?

And he said: I don't know, I think I slipped on gravel, or I tripped, or whatever.

And what happened?

And he says: Well as I tripped, my arm went forward. And he said the gun fired. And he said: And I heard the guy moan, or make a sound. And he said: He grabbed his side. And I realized that I had, I had hit him.

I queried him more on what he had tripped on, and whatever.

He said: I don't know, I just slipped on something. I think I tripped on the gravel, and my arm went forward.

Your finger was on the trigger?

Yeah, it was on the trigger.

> And then again, like I said, he says: But you know, it wasn't
> supposed to happen like that. It wasn't supposed to happen
> like that, you know, a foot or a leg. But he says: it wasn't
> supposed to happen like that.

(Tr. at 239-40.) Detective Alger also testified that the petitioner told him that he spoke to Givargidze about the shooting, but that his statements to Givargidze were only "bragging." (Tr. at 243.)

The petitioner first told Detective Alger about his involvement in the shooting "not long" after he and Detective Volpe went into the interview room. Detective Alger estimated that he was with the petitioner for approximately forty-five minutes before he confessed. The Detectives continued the interrogation until approximately one o'clock in the afternoon, at which point they took a break. The petitioner was given a sandwich, drinks, and cigarettes. After the lunch break, the petitioner agreed to provide the detectives with a written statement. (Tr. at 245, 249-51.)

The petitioner provided and signed an eight-page handwritten statement, which was admitted into evidence and read to the jury at trial. In his statement, the petitioner stated that before he got out Bertolini's car, Bertolini showed him the gun and commented that "this would be easier than beating the guy with a bat." (Tr. at 252-59.)

> I said, what the f*** am I supposed to do with this? And he said,
> quote, put a shot in his leg, foot, you know, that area, unquote.

16

* * *

> He handed me the gun and told me to go.  I asked what he wanted me
> to do, and he said, knock on the door and shoot him in the doorway.

(Tr. at 256, 257.)  The petitioner began writing his statement at approximately

1:35 p.m. and completed it at approximately 3:05 p.m.  Detective Alger then took

the petitioner to the Nassau County District Attorney's office, where he provided

a videotaped statement.  (Tr. at 261-63.)

On cross-examination, Detective Alger reiterated that the petitioner said

that his statements about the shooting to Givargidze were only bragging, and were

not truthful.  (Tr. at 272.)

### C.      State Court Review

Represented by new counsel, the petitioner appealed his conviction and

sentence to the Appellate Division, Second Department.  On April 23, 2001,

which was after the petitioner filed his Notice of Appeal but before any appellate

brief was filed, he made a motion before Judge Belfi for an order vacating the

judgment of conviction pursuant to New York Criminal Procedure Law § 440.10.

In his Section 440 motion, the petitioner sought to have the court set aside

and vacate his conviction; order a new trial; order that a psychological evaluation

of the petitioner be done concerning the disposition of not responsible by reason

of insanity; or dismiss the charges against him.  The petitioner's Section 440

motion was based on purportedly new evidence "not previously available."

According to the petitioner's appellate counsel Thomas F. Liotti, Esq., it was he, and only he, who was sufficiently alert to the petitioner's characteristics of having a "flat affect" and his being "excessively courteous and extremely deferential" to authority figures.  Struck by these traits of the petitioner, and in conjunction with conversations with the petitioner's family and his review of the trial record, petitioner's appellate counsel retained the services of a forensic psychologist named Dr. Leah Blumberg Lapidus.  According to the Section 440 motion, Dr. Lapidus met with and tested the petitioner, and diagnosed him with "Dependent Personality Disorder."  According to the  petitioner's appellate counsel, "Dependent Personality Disorder" is a mental disease or defect that rendered the petitioner unable to understand or appreciate the nature or consequences of his actions at the time of their occurrence.

Appellate counsel for the petitioner argued that, through no fault of the petitioner's able trial counsel, the petitioner's mental defect remained unnoticed during the trial.  According to the petitioner's appellate counsel, had this information been available to the defense during trial, the petitioner would have been acquitted of all the charges against him, or at least the information could have been presented in the nature of a mitigation defense and led to a result more favorable to him.  "If a jury had heard testimony from Dr. Lapidus, then I believe they would have more readily understood the actions of Christopher Rustici as

lacking in intent."   Among the exhibits annexed to the Section 440 motion is a report from Dr. Lapidus concluding that the petitioner suffers from Dependent Personality Disorder.

On September 21, 2001, Judge Belfi denied the petitioner's Section 440 motion.  Judge Belfi wrote, in part:

> The defendant agues that he has newly discovered evidence, to wit: that the defendant suffered from a diminished capacity or even an extreme emotional disturbance at the time of the crimes that only his appellate attorney could recognize.
>
> The defendant has not submitted any sworn allegations substantiating or tending to substantiate that even with due diligence on his part, he could not have produced at a trial the psychologist's findings concerning his personality disorder.   C.P.L. Sec. 440.10(1)(g).  Therefore the defendant has not met his burden and his motion is denied.
>
> In fact the arguments and affidavits submitted to this Court belie any argument that with due diligence this evidence could not have been produced at trial.  If the defendant's appellate attorney could detect this disorder immediately upon meeting his client as he submits to this Court in his Affirmation, then clearly this evidence could have been produced at trial. . . . There is not one scintilla of sworn fact submitted to this Court that this diminished capacity defense was not realized or could not have been realized at the time of trial with due diligence, notwithstanding Mr. Liotti's claim that only he could recognize this disorder in his client.
>
> Even if the Court felt that this so called personality disorder was in fact newly discovered evidence as discussed infra this evidence would not have resulted in a more favorable verdict for the defendant.  C.P.L. Sec. 440.10(1)(g).  The People's evidence was overwhelming.

Petitioner's Br., Ex. C (Sept. 21, 2001 Order of Hon. Donald E. Belfi).

On October 24, 2001, the petitioner made a motion for leave to appeal the denial of his Section 440 motion. On December 12, 2001, the Appellate Division, Second Department, granted this request. Because his appeal from his judgment of conviction and sentence had not yet been perfected, the petitioner filed a joint-brief covering both appeals with permission from the Appellate Division.

In his consolidated appeal, the petitioner raised the following seven arguments: (1) he suffered from a severe dependent personality disorder which prevented him from understanding the nature and consequences of his actions at the time of the incident and that this evidence should have been presented to the trier of fact; (2) his statements to law enforcement and the District Attorney were made involuntarily; (3) the presentation of this psychological evidence at trial would have enabled the defendant to be found not guilty by reason of insanity or guilty of a lesser charge due to extreme emotional disturbance or diminished capacity or to be found not guilty; (4) the trial court erred in not granting his Section 440 motion; (5) he was given an illegal consecutive sentence for possession of a weapon; (6) the court erred in not charging the jury on mistake of fact; and (7) the court erred in allowing the prosecution to ask questions regarding the petitioner threatening his sister and also that the deceased was a volunteer fireman.

On March 17, 2003, the Appellate Division unanimously affirmed the

petitioner's judgment of conviction and Judge Belfi's order denying the Section

440 motion.  The Appellate Division wrote:

> The defendant's contention that the evidence was legally insufficient
> is unpreserved for appellate review.  In any event, viewing the
> evidence in the light most favorable to the prosecution, we find that
> it was legally sufficient to establish the defendant's guilt of murder
> in the second degree beyond a reasonable doubt.  Moreover, upon the
> exercise of our factual review power, we are satisfied that the verdict
> of guilt on the charge of murder in the second degree was not against
> the weight of the evidence.

> The defendant's motion pursuant to CPL 440.10 to vacate the
> judgment of conviction was properly denied.  The defendant failed to
> meet his burden of demonstrating that the evidence submitted on the
> motion could not have been produced at the trial with due diligence
> or that the evidence was such that it would probably change the result
> if a new trial were granted.

> The defendant's remaining contentions are either unpreserved for
> appellate review or without merit.

People v. Rustici, 303 A.D.2d 606, 756 N.Y.S.2d 498 (2d Dep't 2003).  On

March 31, 2003, the petitioner made a request for leave to appeal to the Court of

Appeals.  On July 10, 2003, the Court of Appeals denied this request.  People v.

Rustici, 100 N.Y.2d 586, 796 N.E.2d 489, 764 N.Y.S.2d 397 (2003).

## II.     DISCUSSION

### A.       Standards of Review

The Antiterrorism and Effective Death Penalty Act (the "AEDPA")

provides that a federal habeas court may grant habeas relief to state prisoners with

respect to any claim that was adjudicated on the merits in state court proceedings only if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also DeBerry v. Portuondo, 403 F.3d 57, 66 (2d Cir. 2005) (discussing the federal habeas review standard set forth in Section 2254). It is well-settled that a state court's findings of fact are entitled to a "presumption of correctness" that the petitioner in question must rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"A state-court decision is 'contrary' to clearly established federal law within the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent." Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)) (internal quotation marks omitted). "A state court decision involves 'an unreasonable application' of clearly established Federal law if the state court applies Federal law to the facts of the case in an objectively unreasonable manner." Brisco v. Phillips, 376 F. Supp. 2d 306, 311 (E.D.N.Y. 2005); see also

Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1439, 161 L. Ed. 2d 334 (2005) (citing Williams, 529 U.S. at 405, 120 S. Ct. 1495); Serrano v. Fischer, 412 F.3d 292, 296 (2d Cir. 2005) (citations omitted). "[I]it is well-established in [this] Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Rosa v. McCray, 396 F.3d 210, 219 (2d Cir. 2005) (citing Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003)).

Under the AEDPA, a court does not decide "whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time." Brown v. Greiner, 409 F.3d 523, 533 (2d Cir. 2005); see also Williams, 529 U.S. at 405, 120 S. Ct. at 1495.

It is well-settled that "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). In this regard, the United States Supreme Court opined that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). On the contrary, "a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States."  Id. at 68, 112 S. Ct. 475 (citations omitted).

**B.      Exhaustion**

Section 2254(b) provides that no "application for a writ of habeas corpus [made on] behalf of a person in custody pursuant to the judgment of a state court shall . . . be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b).  In the interest of comity and in keeping with the requirements of Section 2254(b), this exhaustion requirement precludes a federal court from considering claims that have not first been "fairly presented" to the courts of the state in which the petitioner stands convicted.  Ayala v. Speckard, 89 F.3d 91, 94 (2d Cir. 1996) (citing Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct.  509, 30 L. Ed. 2d 438 (1971)); see also Rhines v. Weber, 544 U.S. 269, 273-74, 125 S. Ct.  1528, 161 L. Ed. 2d 440 (2005) (citations omitted).

To satisfy the exhaustion requirement, the petitioner must have presented both the factual and legal basis of his federal claims asserted in the habeas petition to the highest court of the state.  Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997).  "Where appeals to a state's highest court are discretionary, complete exhaustion occurs only where a petitioner has sought

discretionary review of each claim he seeks to assert under Section 2254." <u>Ashby v. Senkowski</u>, 269 F. Supp. 2d 109, 114 (E.D.N.Y. 2003) (citing <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842-43, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999)).

Where " 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claims procedurally defaulted." <u>See</u> <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).  The Court will not review the merits of a procedurally defaulted claim unless the petitioner can show " 'cause for the default and actual prejudice' or that 'failure to consider the claims will result in a fundamental miscarriage of justice.' "  <u>Jimenez v. Walker</u>, 458 F.3d 130, 149 (2d Cir. 2006).  However, a habeas court has the power to deny a petition on the merits even where there has not been exhaustion.  <u>See</u> 28 U.S.C. § 2254(b)(2).

### C.     As to the Petitioner's Claims

#### 1.     Claims Related to New Evidence of a Personality Disorder

Four of the petitioner's claims raised in his habeas petition demand relief on the basis of evidence—acquired after his trial and conviction—that he argues would have resulted in his acquittal or a more favorable verdict if presented to the

jury.  The evidence upon which these arguments are based consists primarily of the diagnostic report of forensic psychologist Dr. Leah Blumberg Lapidus.  Dr. Lapidus concluded that the petitioner suffers from Dependent Personality Disorder and, because of this disorder, that he was not responsible for the crimes of which he was convicted.

The petitioner's four claims based on this "new" evidence are that (1) if this testimony were presented at trial the jurors would have found him not guilty; (2) because of his personality disorder the petitioner's waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was not made knowingly, voluntarily, and intelligently, in violation of his rights under the Fifth Amendment; (3) the presentation of this personality-disorder evidence at trial would have resulted in the petitioner being found not guilty by reason or insanity or guilty of a lesser charge due to extreme emotional disturbance and diminished capacity or found not guilty; and (4) that his Section 440 motion should have been granted and that the trial court should have ordered an evidentiary hearing on the basis of this new evidence.

"A claim 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.' " Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003) (quoting Herrera v. Collins, 506 U.S.

390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)) (additional citation omitted);

see also Townsend v. Sain, 372 U.S. 293, 317, 83 S. Ct. 745, 759, 9 L. Ed. 2d 770

(1963) ("[T]he existence merely of newly discovered evidence relevant to the

guilt of state prisoner is not a ground for relief on federal habeas corpus),

overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct.

1715, 118 L. Ed. 2d 318 (1992); Ortiz v. Woods, 463 F. Supp. 2d 380, 394

(W.D.N.Y. 2006) ("[A]n independent constitutional violation . . . is a prerequisite

for bringing a colorable claim based on newly discovered evidence."); Tirado v.

Senkowski, 367 F. Supp. 2d 477, 490 (W.D.N.Y. 2005) ("A claim based on newly

discovered evidence has never been held to state a ground for federal habeas

relief absent an independent constitutional violation occurring in the underlying

state criminal proceeding.") (internal quotation marks and citation omitted).

The petitioner's first and third grounds for habeas relief, namely that

(1) that the jury would have found him not guilty if they knew of his personality

disorder and (3) if this evidence of a personality disorder was presented at trial he

would have been found not guilty or guilty of a lesser charge, are duplicative.

Neither raises an independent claim of a constitutional violation.  Assuming that

evidence of the petitioner's personality disorder qualifies as "newly discovered

evidence," these arguments are aimed directly at the issue of the petitioner's guilt

or lack of guilt, rather than the constitutionality of his conviction.  Such claims

generally are not cognizable in the Federal court in a habeas proceeding.  See

Herrera, 506 U.S. at 400, 113 S. Ct. 853; Pino v. Sears, No. 03CV2945, 2006 WL

3782860, at *2 (E.D.N.Y. Dec. 22, 2006); Green v. Walsh, No. 03CV0908, 2006

WL 2389306, at *18 (S.D.N.Y. Aug. 17, 2006).  Accordingly, the petition for

habeas relief on these grounds is denied.

The petitioner's second claim does raise a claim of a constitutional

violation, namely that because of his personality disorder his waiver of his

Miranda rights was not knowing, intelligent, and voluntary, in violation of the

requirements of the Fifth Amendment.  However, this claim also fails because the

evidence of the petitioner's personality disorder is not, in fact,  "newly discovered

evidence."  This Court agrees with Judge Belfi that there is nothing in the record

that suggests that this evidence was not available during the trial or that it could

not have been discovered at that time.  See Serran v. Walsh, No. 04CIV8615,

2005 WL 3340578, at *10 (S.D.N.Y. Dec. 9, 2005).

To be clear, the petitioner does not make a claim of ineffective assistance

of his trial counsel.  The petitioner's argument is that although his trial counsel

was experienced and well-qualified to represent him at the trial, his

representatives simply were less able to recognize the symptoms of psychological

impairments as is his appellate counsel.  Accepting the petitioner's appellate

counsel's representations as true, the fact that the petitioner hired trial counsel

less adept at recognizing psychological impairments than his appellate counsel does not render the existence of that impairment "undiscoverable" through due diligence.

The petitioner's appellate counsel states that Rustici's symptoms of a personality disorder—among other things, his "slow and lethargic affect," "very agreeable" manner, and "compliant attitude"—were "obvious," albeit only to him. (Petitioner's Br. at 11.) However, it is apparent from the record of the trial that the petitioner's trial counsel did, in fact, recognize these characteristics of the petitioner. Counsel remarked during his closing arguments that the petitioner was "influenced in all the wrong ways"; "not strong enough to resist the pressure"; "was too easily led"; "was being easily influenced"; and "was guilty of not having a strong enough character to resist the need to impress his friends." (Tr. at 530-31.)

These characteristics were apparent to the petitioner's trial counsel. Through due diligence, it could have been discovered that these traits were also symptoms of Dependent Personality Disorder. The Court holds that the evidence of the petitioner's Dependent Personality Disorder is not "newly discovered evidence," and it will not be considered in connection with the Court's determination of this petition. See, e.g., Henry v. Wainright, 743 F.2d 761, 762 (11th Cir. 1984) (rejecting the petitioner's habeas claim based on the discovery of

"new evidence" "in the form of a recent mental evaluation showing that [he] was an intellectually limited, brain-damaged individual with very poor judgment, and a propensity to impulsive action and violence" because the facts underlying this claim were known or reasonably should have been known to the defendant and his counsel at the time of his sentencing and trial).

Even if the Court were to consider the evidence of the petitioner's personality disorder as "new evidence," the burden on a petitioner in making out a claim of actual innocence based on new evidence is extremely high.  House v. Bell, --- U.S. ---, 126 S. Ct. 2064, 2076-77, 165 L. Ed. 2d 1 (2006); Day v. Taylor, 459 F. Supp. 2d 252, 257 (S.D.N.Y. 2006) ("Without new, clearly exculpatory evidence, even a meritorious claim of a constitutional violation may be insufficient grounds for excusing a procedural default.").  The defendant "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " House, 126 S. Ct. 2076-77 (quoting Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).  The petitioner failed to meet this high burden through the submission of Dr. Lapidus' report and diagnosis.  See, e.g., Boyde v. Brown, 404 F.3d 1159, 1168-69 (9th Cir. 2005) (holding that new mental health evidence, obtained after the trial, was insufficient to establish habeas petitioner's innocence.  "Because psychiatrists disagree widely and frequently on what

constitutes mental illness, a defendant could . . . always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion.") (internal quotation marks and citation omitted).

Finally, the Court also rejects the petitioner's argument that the trial court erred in not ordering an evidentiary hearing on the basis of the "new evidence" submitted in support of the Section 440 motion. Under New York's Criminal Procedure Law, the Court may deny a Section 440 motion on the merits without conducting a hearing if "[t]he moving papers do not allege any ground constituting legal basis for the motion." N.Y.C.P.L. 440(4)(a). "Whether or not to hold a hearing on a motion to vacate [a] judgment upon the ground of newly discovered evidence is discretionary with the court to which the motion is addressed." People v. Crimmins, 38 N.Y.2d 407, 416-17, 343 N.E.2d 719 (1975) (citations omitted). The State Court does not need to hold a hearing "where the court is able to reach its conclusion on the papers alone," because to do so "would serve no end of justice but would only protract futile litigation." Id. (citations omitted).

In this case, the trial court's decision not to order an evidentiary hearing on the basis of the petitioner's "new evidence" was not error because Judge Belfi was able to determine on the papers alone that the petitioner could have discovered his purported personality disorder at or before the time of the trial and,

thus, there was no legal basis for his claim.  See People v. Rivera, 12 Misc. 3d

1198(A), 824 N.Y.S.2d 769, 2006 WL 2423136, at *12 (N.Y. Sup. Ct. 2006)

(denying Section 440 motion based on new evidence without a hearing where the

defendant failed to act with due diligence).  Judge Belfi's resolution of the motion

without a hearing was proper under New York State law, and did not did not

violate clearly established Supreme Court precedent or Federal law.  See 28

U.S.C. § 2254(d); see also Reed v. Duncan, No. CIV 900CV1177 LEKRFT, 2007

WL 133798, at *7 (N.D.N.Y. Jan. 12, 2007) (holding that the trial court's denial

of the petitioner's request to hold an evidentiary hearing on a motion to withdraw

his guilty plea did not "offend deeply rooted or fundamental principles of justice"

and was "neither contrary to, nor an unreasonable application of, clearly

established law.").

> ### 2.    The Petitioner's Claim that He Received an Illegal Consecutive Sentence for Possession of a Weapon

The petitioner argues that his sentence was illegal and excessive because

the court imposed consecutive sentences for two offenses— second degree

murder and second degree criminal possession of a weapon—that were

committed by one continuous act, in violation of New York law.  Under New

York State law, the court must impose sentences to run concurrently when "two

or more offenses are committed through a single act or omission."  N.Y. Penal

Law § 70.25(2).  However, "there is 'no constitutionally cognizable right to

concurrent, rather than consecutive, sentences.' " United States v. McLean, 287 F.3d 127, 136-37 (2d Cir. 2002) (citing United States v. White, 240 F.3d 127, 135 (2d Cir. 2001)).

Sentences that fall within the range prescribed by state law are not reviewable in a habeas proceeding. White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); Pena v. Rivera, No. 05 Civ. 3109(LTS)(FM), 2006 WL 2265078, at *8 (S.D.N.Y. July 31, 2006). Moreover, "[t]he assertion that a sentencing judge abused his or her discretion in sentencing is generally not a federal claim subject to review by a habeas court." Egbert v. David, Nos. 02-CV-503, 03-MISC-0066, 2003 WL 23199557, at *6 (E.D.N.Y. Dec. 11, 2003) (citing Fielding v. LeFevre, 548 F.2d 1102, 1109 (2d Cir. 1977)).

Thus, "federal habeas courts have squarely held that claims regarding the imposition of consecutive sentences are purely a matter of state law and are not cognizable on habeas review." Figueroa v. Grenier, No. 02 Civ.5444, 2005 WL 249001, at *15 (S.D.N.Y. Feb. 3, 2005); see also Davis v. Herbert, No. 02-CV-04908, 2003 WL 23185747, at *15 (E.D.N.Y. Oct. 24, 2003) ("Whether the sentence could be consecutive was a matter of state law and raises no Constitutional issue."); Heath v. Hoke, No. 88-770E, 1989 WL 153759, at *3 (W.D.N.Y. Dec. 7, 1989) ("[A] state court's interpretation of state law on concurrent and consecutive sentences is not a question of federal constitutional

dimension cognizable in a federal habeas corpus proceeding."). "In order to violate the Eighth Amendment's prohibition on cruel and unusual punishment, a sentencing decision must present 'extraordinary circumstances.' " <u>Scullark v. Greiner</u>, No. 02CIV1834, 2005 WL 3454730, at *4 (S.D.N.Y. Dec. 15, 2005) (citations omitted). No such circumstances are present here.

According to the petitioner's own testimony at the trial, he took the gun as he left Bertolini's car, walked past Behr's house, and then walked back to the car. Then, when prompted by Bertolini, the petitioner approached Behr's house again. Based on these facts and other evidence at the trial, it was reasonable for Judge Belfi to determine that the petitioner's criminal act of possessing the gun was completely independent of the petitioner's act of shooting Behr. Although the amount of time that passed between the petitioner's receipt of the gun and the time it discharged was not great, it is clear from the petitioner's own account of the events that the two offenses did not constitute a single continuous act.

Even if the petitioner is correct that Judge Belfi's interpretation of the circumstances was erroneous under New York law, this would not be a basis for granting habeas relief. It is not the province of the federal habeas court to reexamine state-court determinations on questions of state law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted); see also Figueroa, No. 02 Civ.5444, 2005 WL 249001, at *15 (S.D.N.Y. Feb. 3, 2005). Accordingly, the petition for habeas relief on the ground of an illegal consecutive sentence or excessive sentence is denied.

### 3. As to the Jury Charge

The petitioner asserts that the trial court erred in its jury charge by "not charging the jury on accident or mistake of fact." " 'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.' " Sams v. Walker, 18 F.3d 167, 171 (2d Cir. 1994) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)); see also Estelle v. McGuire, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); Henderson v. Kibbe, 431 U.S. 145, 154-55, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); DelValle v. Armstrong, 306 F.3d 1197, 1201 (2d Cir. 2002).

Further, "[w]here the claimed error is not an erroneous jury instruction but the failure to give a requested instruction, the petitioner bears an especially heavy

burden in showing that the trial court's failure to give the instruction to the jury was an error of constitutional magnitude." Williams v. Bennett, 2001 WL 849746, at *10 (S.D.N.Y. July 27, 2001) (citing Henderson, 431 U.S. at 155, 97 S. Ct. 1730) ("An omission, or an incomplete instruction, is less likely to be prejudicial than is an actual misstatement of the law.").

The failure to charge the jury on an appropriate defense can result in a deprivation of due process if the refusal to give the instruction was "sufficiently harmful to make the conviction unfair." Jackson v. Edwards, 404 F.3d 612, 624 (2d Cir. 2005) (citations omitted). Before the Court may grant habeas relief on the basis of a missing charge, the Court must resolve three questions in the petitioner's favor: (1) was the petitioner entitled to the omitted charge under state law?; if so, (2) did the trial court's failure to deliver that charge result in a denial of due process; and if so, (3) did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law? Jackson, 404 F.3d at 621.

Here, the petitioner highlights two perceived errors of omission in the trial court's jury charge. First, the petitioner contends that the Court should have charged the jury regarding a "mistake of fact" under New York law. Second, the petitioner argues that the court failed to charge the jury that "in the event the jury finds, or accepts credible evidence that indicates that the act was in fact accidental

in nature, then by that finding they are precluded from considering murder in the second degree." In the Court's opinion, the petitioner is not entitled to habeas corpus relief on the basis of either omission because the petitioner was not entitled to either charge under state law.

With respect to "mistake of fact," at the trial the petitioner neither requested such an instruction nor objected to its omission from the charge. Furthermore, the petitioner did not establish why a "mistake" instruction would have been appropriate in this case. Under New York law, a defendant may be relieved of criminal liability for conduct because he or she engaged in that conduct under a mistaken belief of fact, if that factual mistake negates the mental state required for the crime. N.Y.C.P.L. § 15.20(1)(a). For example, in shooting cases it has been appropriate to charge mistake of fact when the defendant testified that he didn't know the gun was loaded. See People v. Grinage, 269 A.D.2d 780, 781, 704 N.Y.S.2d 404, 404 (4th Dep't 2000); People v. Rypinski, 157 A.D.2d 260, 263, 555 N.Y.S.2d 500, 502 (4th Dep't 1990).

Here, there is no evidence that the petitioner did not know that the gun was loaded or that he was mistaken about any fact related to the shooting death of Paul Behr. In support of his argument that the trial court should have instructed the jury as to a mistake of fact, the petitioner points to Detective Alger's testimony that "Rustici's repeated statements that the shooting was an accident

were totally consistent with his forensic findings with respect to the trajectory and angle of the bullet wound." As the District Attorney noted in its brief in opposition to the petitioner's direct appeal, the petitioner fails to explain how Detective Alger's testimony regarding the trajectory of the bullet evidences any unidentified mistake of fact on the petitioner's part that would negate his recklessness, which was the required mental state for the offense of depraved indifference murder at the time that Rustici was convicted. Thus, the Court finds no error in the trial court's failure to deliver a mistake of fact charge to the jury.

With regard to an accident, the petitioner contends that an accidental shooting can never support a conviction for depraved indifference murder, and that the jury should have received an instruction to that effect. The petitioner did specifically request an instruction regarding his testimony that the shooting was accidental.

MR. CARRA: . . . With regard to the charge, and more specifically the murder in the second degree; it is defense counsels' request that pursuant to People vs Cunningham 635 NYS2d 304, that the Court charge that in the event the jury finds, or accepts credible evidence that indicates that the act was in fact accidental in nature, then by that finding they are precluded from considering murder in the second degree.

Defense counsel would concede that under that charge, that the Court could then instruct the jury; the fact that they do find it to be accidental in nature would only preclude the

|                | murder two. And that the jury could still go on to consider the lesser included offenses thereof. |
|----------------|--------------------------------------------------------------------------------------------------|
| THE COURT:     | District Attorney wish to respond? |
| MS. WATSON:    | Yes, Judge. I would oppose that. Under the present facts; the defendant having a loaded gun, knowing it was loaded, and the circumstances under which it was fired, I believe that even if they think it is an accident, it was still, or could rise to depraved indifference. |
| THE COURT:     | Anything further? |
| MS. WATSON:    | No, Judge. |
| THE COURT:     | Anything further? |
| MR. LONDON:    | No. |
| THE COURT:     | I think according to the Court's recollection, the defendant's admission of reckless conduct should be defined rather than just referred back. And that will be done. |

(Tr. at 496-96.)

It is not clear from this colloquy whether the trial court granted or denied the petitioner's request for a specific instruction. However, the petitioner did specifically request an "accident" instruction, and the trial court did not deliver it to the jury when second degree murder was explained in the charge. (Tr. at 575-578.). For the reasons stated below, similar to the omission of the mistake of fact

charge, the Court finds no error in the trial court's failure to deliver an accident instruction to the jury.

In support of his argument that the jury should have been instructed with regard to an accidental act, the petitioner relies on People v. Cunningham, 222 A.D.2d 727, 730, 635 N.Y.S.2d 304, 309 (3d Dep't 1995). In Cunningham, the Appellate Division, Third Department held that it was error for the trial court not to instruct the jury that they must acquit the defendant of depraved indifference murder if they found that the shooting was accidental. Id. Cunningham was charged with depraved indifference murder for shooting a man in the chest with a shotgun. He admitted pointing the shotgun at the victim's chest, but claimed that the gun fired accidentally as Cunningham handed the gun to the victim and the victim pulled the weapon. The Appellate Division, Third Department, held that the court's failure to charge the defense of accident when requested to do so was error. 222 A.D.2d at 729, 635 N.Y.2d at 309. However, the Court also held that this error was harmless because the proof of the defendant's guilt of depraved indifference murder was overwhelming, and "the issue of accident was argued before the jury and defendant's evidence of accident consisted only of his conclusory statement and was obviously rejected by them." Id.

In contrast to Cunningham, the Court has found several cases affirming depraved indifference murder convictions even if the gun discharged accidentally.

See, e.g., People v. Haley, 195 A.D.2d 873, 600 N.Y.S.2d 842 (3d Dep't 1993);

People v. Rammelkamp, 167 A.D.2d 560, 562 N.Y.S.2d 231 (2d Dep't 1990). In

Haley, the Appellate Division held that the defendant could be convicted of

depraved indifference murder for the shooting death of two boys even if the gun

discharged accidentally. Haley, 195 A.D.2d at 874, 600 N.Y.S.2d at 845. The

Court wrote:

> If the rifle truly was capable of being discharged without the trigger having been pulled, the jury could have found that by loading the gun, removing the safety and pointing such a dangerous weapon directly at another person at close range, defendant engaged in an act which he knew was "imminently dangerous and presented a very high risk of death," and that such conduct evinced a wanton disregard for human life.

Id. (citations omitted).

Similarly, in Rammelkamp, the defendant was convicted of depraved

indifference murder for appearing at a bar with a loaded handgun and displaying

it with his finger on the trigger. Rammelkamp, 167 A.D.2d at 561, 562 N.Y.S.2d

at 232. The gun discharged four times when the bartender struggled with the

defendant to gain control of the gun. Id. The Appellate Division held that "[t]he

jury was . . . entitled to find that the defendant created a grave risk of the

bartender's death and caused his death under circumstances evincing a depraved

indifference to human life." Id.; see also People v. Melendez, 11 A.D.3d 983,

983, 782 N.Y.S.2d 893, 894 (4th Dep't 2004) (concluding that the "defendant's

act of holding a gun that ultimately discharged close to the victim's face in the course of scuffle was an act sufficiently reckless to create a grave and substantial risk of death"); <u>People v. Rosario</u>, 208 A.D.2d 961, 961, 617 N.Y.S.2d 887, 887 (2d Dep't 1994) (concluding that the evidence was sufficient to establish the defendant's guilt of depraved indifference murder beyond a reasonable doubt in a case where the defendant testified that the gun fired accidentally during a struggle, as he was backing away from the victim.)

These cases indicate that the court was not required to instruct the jury that, should they credit the petitioner's testimony and determine that the firing of the gun was accidental, that they would be precluded from finding the petitioner guilty of second degree murder. Thus, the Court finds that there was no error in the trial court's failure to deliver an accidental act instruction to the jury.

In addition, although the Appellate Division in <u>Cunningham</u> found that it was error not to deliver the requested accident instruction, they also ruled that this error was harmless. <u>See</u> <u>Cunningham</u>, 222 A.D.2d at 730, 635 N.Y.S.2d at 308-09. Were this Court to find that the petitioner was entitled to an accidental act instruction under <u>Cunningham</u>, the Court would also find that any error resulting from that omission was harmless.

The proof of the petitioner's guilt was overwhelming. It was undisputed at the trial that Bertolini recruited the petitioner to cause harm to Behr. In the

petitioner's statement he told the police that Bertolini told him to shoot Behr.  The petitioner took a gun with him from Bertolini's car before approaching Behr.  The petitioner knew the gun was loaded, and approached Behr with his finger on the trigger.

The defense did argue to the jury that the discharge of the gun was an accident.  The jury was free to reject this argument, and with reasonable certainty they did, because it was based entirely on the petitioner's own statements and it conflicted with other evidence in the record.  Specifically, the petitioner's claim of accident was contradicted by his own testimony that the gun "did not discharge by itself" and that he "pulled the trigger"; Givargidze's description of the shooting as told to him by the petitioner; the petitioner's own written statement in which he said that Bertolini instructed him to shoot Behr in the foot or the leg; and the testimony of Detective Alger that the petitioner admitted that he was only "supposed" to shoot Behr in the foot or the leg.

Even if the Court were to hold that the Court should have instructed the jury as to an accident, the failure to do so was harmless, and certainly was not "sufficiently harmful to make the conviction unfair."  Jackson v. Edwards, 404 F.3d 612, 624 (2d Cir. 2005) (citations omitted).  The Court finds no reasonable likelihood that the jury would have found in the petitioner's favor on the charge

of second-degree murder had the requested instruction been given.  See Blazic v. Henderson, 900 F.2d 534, 542 (2d Cir. 1990); cf. Jackson, 404 F.3d at 625.

In sum, the petitioner has failed to show that the trial court erred in its charge to the jury, or that such an error with respect to the charge resulted in a violation of his federal rights.  Accordingly, the petition for habeas relief on the ground that the trial court failed to properly instruct the jury is denied.

### 4. The Petitioner's Claim that the Prosecution Committed Gross Misconduct in Disregarding Motions In Limine

Next, the petitioner argues that he was deprived of a fair trial because the prosecution "deliberately and intentionally" violated in limine rulings.  The two instances of misconduct assigned by the petitioner are that the prosecution (1) elicited testimony that Behr was a volunteer fireman; and (2) cross-examined a defense character witness about the petitioner's commission of a prior bad act.

"The Supreme Court has instructed federal courts reviewing habeas petitions premised upon prosecutorial misconduct to distinguish between ordinary trial error of a prosecutor and the sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process."  Goines v. Walker, No. 97-cv-3512, 2000 WL 976657, at *6 (E.D.N.Y. July 12, 2000) (quoting Donnelly v. DeChristophoro, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873, 40 L. Ed. 2d 431 (1974)) (internal quotation marks omitted).  The Court must determine whether the prosecutor's actions "were so prejudicial that they rendered the trial

44

fundamentally unfair.'" <u>See</u> <u>Garofolo v. Coomb</u>, 804 F.2d 201, 206 (2d Cir. 1986)

(citation omitted); <u>United States ex rel. Haynes v. McKendrick</u>, 481 F.2d 152 (2d

Cir. 1973)); <u>see</u> <u>also</u> <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 252 (2d Cir. 1998)

(quoting <u>Bentley v. Scully</u>, 41 F.3d 818, 823 (2d Cir. 1994)) ("To be entitled to

relief, [a petitioner] must show 'that he suffered actual prejudice because the

prosecutor's comments [at trial] . . . had a substantial and injurious effect or

influence in determining the jury's verdict.").  The Court must consider "the

severity of the misconduct; the measures adopted to cure the misconduct; . . . and

the certainty of conviction absent the improper statements."  <u>Tankleff</u>, 135 F.3d at

252 (citations omitted).

### a.    As to the "Fireman" Question

The prosecution's alleged misconduct regarding questions about whether

the victim was a volunteer fireman occurred at the beginning of cross-

examination of the petitioner.  The following exchange took place:

> Q.    Mr. Rustici, you said that as you sit here today, that you're 25 years old?
>
> A.    Yes.
>
> Q.    Do you know how old Mr. Behr would have been today had he been alive?
>
> MR. LONDON:        Objection.
>
> THE COURT:         Overruled.

45

A.     No.

     MR. LONDON:    Relevance, your Honor, just so that the record is clear, the basis of my objection.

Q.     Do you know anything about Mr. Behr's family?

     MR. LONDON:    Objection.

     THE COURT:    Overruled.

A.     No.

     MR. LONDON:    Again, relevance, your Honor.

     MS. WATSON:    Judge, I would ask that there not be an argument after every question that I ask, please.  If there is an objection, that is one thing.

     MR. LONDON:    I have to make a record, your Honor.

     THE COURT:    The objection speaks for itself.

Q.     So you knew nothing about his family; is that correct?

A.     Yes.

Q.     Did you know anything - -

     THE COURT:    Speak up, please.

A.     No.

Q.     Did you know the names of his brothers and sisters?

     MR. LONDON:    Objection.

     THE COURT:    Overruled.

A.       No.

Q.       Did you know where he worked?

A.       No.

          MR. LONDON:          Objection.

          I ask for a mistrial at this point, your Honor.

          THE COURT:            Objection overruled.

          MR. LONDON:          These questions have no relevance,
                                          and they are intended to prejudice the
                                          jury.

          THE COURT:            Motion is denied.

          MR. LONDON:          Respectfully except.

Q.       Did you know that he was a fireman?

          MR. LONDON:          Objection.

          THE COURT:            Overruled.

A.       No.

(Tr. at 350-53.)

          At a side bar, the petitioner's trial counsel continued to object to questions

regarding whether the petitioner knew anything about Behr before he went to his

house to assault him on the ground that this line of questions were irrelevant and

in violation of a pre-trial ruling.  The petitioner made a motion for a mistrial

based on this prejudicial questioning.  The trial court denied this motion.  The

petitioner's trial counsel asked for a curative instruction, which was also denied. (Tr. at 353-57)

The petitioner does not specifically identify any pre-trial <u>in limine</u> ruling by the trial court that was violated by this line of questioning. The prosecution believes that the petitioner is referring to an evidentiary ruling made in connection with the proposed testimony of Patricia Behr, the People's first witness. At the time that this first witness was called, but before any questions were asked, the petitioner's counsel asked to approach the bench and objected to the prosecution being permitted to ask Patricia Behr about "where Mr. Behr had gone during the course of the day" and "what he had done prior to the transpiration [sic] of the events that occurred." The petitioner did not object to questions about "where [Behr] lived, and who he was." (Tr. at 37.)

The prosecutor responded that she was attempting to establish that the petitioner and the victim had no connection to each other at all. The court ruled that the prosecutor would not be precluded from going into "a brief description of where [Behr] was earlier that day, and for the purpose of establishing evidence that [Behr and Rustici] did not know each other." (Tr. at 38-39.) The Court does not interpret this ruling as expressly precluding the admission of testimony that Behr was a volunteer fireman. Also, the petitioner does not provide the Court

with any other ruling of the trial court that could be interpreted as precluding testimony about Behr being a fireman.

The only indication that any such ruling was made is a statement by the prosecutor during the direct examination of the petitioner. During a sidebar, the prosecution objected to a line of questioning by the petitioner's counsel as irrelevant.

| | |
|---|---|
| MS. WATSON: | Judge, I understand this is the defendant. And it is in the Court's discretion to give a lot of leeway. But it seems to me that anything that happened in '89, and even the questions that precede it about coming from a divorced family, is being offered for no reason other than to engender sympathy. |
| | And I would ask for some type of offer of proof as to the relevancy of something that he is going - - |
| MR. LONDON: | I might say, it is not any different from the district attorney bringing out things about Paul Behr's life that are totally irrelevant; that he was a volunteer fireman, that he was a carpenter, that he had a family. It is irrelevant. |
| THE COURT: | Counsel, what is your offer? |
| MR. LONDON: | I don't intend to go far at all. He is just going to mention he had an accident. He broke his knee. And that is it. I'll move on. |
| MS. WATSON: | Judge, I was precluded by the Court from mentioning that Mr. Behr was a volunteer fireman. And I stuck to that ruling. How |

> does him breaking his leg have anything to do
> with this?

(Tr. at 303-04.)  The trial court overruled the objection and the petitioner's counsel was allowed to continue that line of questioning and then move on.

Based on the prosecutor's statement, assuming that the Court precluded her from mentioning that Behr was a volunteer fireman and that the challenged line of questioning did violate that ruling, this single question by the prosecutor was not so inflammatory and prejudicial as to render the entire trial fundamentally unfair.  The jury heard testimony, on at least four occasions prior to the time when the petitioner took the stand, that directly stated or implied that the victim was a fireman.  These questions were asked and answered mostly without objection from the petitioner's trial counsel.

Patricia Behr was asked the following question and gave the following answer:

Q       And what time was it that Paul left your parents' house?

A       3:30 to go to the firehouse and go home.

The petitioner did not object.  (Tr. at 46.)

During cross-examination by the petitioner's trial counsel, Detective Leo Smith, Crime Scene Investigator, was asked questions about the clothes that Behr was wearing at the time of the shooting and gave the following answers:

Q   So the only thing you took is the bloody, what I believe --
    was a shirt?

A   It was a T-shirt, yes.

Q   A T-shirt?

A   Right.

Q   Did you examine it before you put it in the bag?

A   Yes.

Q   And what did you observe when you examined it?

A   There was writing on the shirt to the effect of, Syosset Fire
    Department.  And there was also a hole in the shirt.

The petitioner did not object.  (Tr. at 116-17.)

Later in the trial, Detective Alger testified as follows:

Q   Did you ask [the petitioner] about if he knew anything about
    the person he had shot?

A   I asked him if he knew.  And the only thing that he did tell me
    that he later learned or read about, that in fact that this
    individual was a volunteer fireman, that it was a fireman from
    Syosset.  That was really the only information he knew about
    the individual.

(Tr. at 244.)  Although the petitioner's counsel did object to this answer, the

objection was on the ground that the answer was "non-responsive" to the

question, and not that it violated any pre-trial ruling or that was inflammatory and

prejudicial.  (Tr. at 244.)  The objection was overruled and the motion to strike

was denied.  Subsequently, Detective Alger read the petitioner's written statement

51

to the police, which contained an admission that the petitioner "saw the television news and learned the guy was a fireman, and he had died from the gunshot wound." (Tr. at 259.)

Finally, the petitioner's counsel commented during his closing argument about the presence of "a sea of blue uniformed volunteer fireman" at the trial. (Tr. at 525.) In consideration of the fact that the jury had already heard testimony that the victim was a volunteer fireman, the Court holds that prosecution's one question of the petitioner on that subject could not have had any effect or influence in determining the jury's verdict. Cf. Tankleff, 135 F.3d at 252. Accordingly, the petition for habeas relief on the ground that the prosecutor asked improper questions about the victim having been a volunteer fireman is denied.

### b. As to the "Prior Bad Act"

The second instance of misconduct that the petitioner complains about occurred toward the conclusion of the trial. During the cross-examination of Frank Ioppolo, a character witness for the petitioner, the prosecution asked the following questions and received the following answers:

Q      Now are you familiar with Mr. Rustici's sisters, or sister?

A      Sister, yes.

Q      What is her name?

A      Shanna.

| Q | What is her last name? |
|---|---|
| A | Rustici. |
| Q | And was her last name at one point Colenzo? |
| A | If she was married, that possibly could be, yes. |
| Q | Well did you hear that Mr. Rustici threatened to kill her and her children?  Did you hear that? |
| A | No, I did not. |

(Tr. at 456-57.)

The petitioner's counsel objected to this line of questioning on the ground that the prosecution had previously represented that no prior bad acts of the defendant would be used by the prosecution at the trial for any purpose.  The petitioner did not ask for a mistrial.  At a side-bar, the petitioner requested that the question be stricken, that a curative instruction be given to the jury, and that the district attorney be admonished in front of the jury.  The prosecution disputed that they represented that no prior bad acts would be used except with regard to the cross-examination of the petitioner.  (Tr. at 457-58.)

The trial court agreed with the petitioner that the district attorney made the representation that there would not be any prior bad acts introduced at the trial.  Thus, the court sustained the objection, admonished the district attorney outside the presence of the jury, ruled that the question and answer should be stricken, and gave a curative instruction to the jury.  (Tr. at 462.)

> THE COURT: Ladies and gentlemen, before we had the side-bar conference here at the bench, there was a question that was asked by the district attorney. And an objection was interposed thereto.
>
> I have found the question to be an improper question. And therefore I strike any answer that may have been given to the question. And strike the question from the record. And I instruct you that no unfavorable inference whatsoever can be drawn from the mere fact that the question was asked.

(Tr. at 463-64.)

The jury is presumed to have followed this curative instruction, which was designed to cure any prejudice that resulted from the improper question. See Pretlow v. Lord, No. 03 CV 2547, 2005 WL 1073609, at *3 (E.D.N.Y. Apr. 29, 2005) (finding no prosecutorial misconduct where the trial judge sustained objections to improper questions); Peakes v. Spitzer, No. 04 Civ. 1342, 2004 WL 1366056, at *18 n.29 (S.D.N.Y. June 16, 2004) ("The jury is presumed to obey a court's curative instruction."); Galdamez v. Keane, Nos. 2000-CV-4066, 03-MISC-0066, 2003 WL 21847382, at *12 (E.D.N.Y. Aug. 4, 2003) ("Assuming, for argument's sake, that there was any error in the cross-examination of defendant, the trial court attempted to correct that error when it told the juror to 'disregard that which occurred.' It can be assumed that the jury followed the court's instruction.") (citing Richardson v. Marsh, 481 U.S. 200, 206, 211, 107 S.

Ct. 1702, 95 L. Ed. 2d 176 (1987)); <u>Green v. Herbert</u>, No. 01 Civ. 11881, 2002 WL 1587133, at *16 (S.D.N.Y. July 18, 2002) (admission of prior crimes evidence did not deprive petitioner of a fair trial in light of the judge's limiting instructions); <u>Cruz v. Greiner</u>, No. 98 Civ. 7839, 1999 WL 1043961, at *31 & n.26 (S.D.N.Y. Nov. 17, 1999) (rejecting the petitioner's argument that "if you throw a skunk into the jury box, you can't instruct the jury not to smell it" and finding that the court's instruction to disregard inadmissible evidence rendered harmless any prosecutorial misconduct) (citations omitted); <u>see also</u> <u>Hogan v. West</u>, 448 F. Supp. 2d 496, 516 (W.D.N.Y. 2006) ("This Court has 'no reason to believe that the jury in this case was incapable of obeying the curative instructions,' given to it by the trial judge.") (citation omitted).

The petitioner presents no evidence that the jury was incapable of obeying the trial court's instruction to disregard the improper question and testimony. Any prejudice resulting from the question was ameliorated by the trial court. The Court finds no error stemming from the fact that the trial court did not declare a mistrial when one was not requested, or that it did not admonish the district attorney in front of the jury. Accordingly, the petition for habeas relief on the ground that the prosecutor asked improper questions, about the victim having been a volunteer fireman or about a prior bad act is denied.

**5. As to the Constitutionality of New York's Depraved Indifference Murder Statute**

The petitioner's next argument is that "there is no principled basis upon which to distinguish depraved indifference [murder] from reckless manslaughter" under New York State law. The petitioner contends that the definition of "depraved indifference" is now so vague that it can be applied by prosecutors to any reckless homicide, and that this vagueness violates both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. This argument is adopted from the case of <u>St. Helen v. Senkowski</u>, 02 Civ. 10248 (CLB), in which the petitioner argued and Judge Brieant agreed that the depraved indifference murder and reckless manslaughter statutes have been "so blurred and conflated by recent interpretive decisions of the New York Court of Appeals with the result that there is no principled basis in which to distinguish the two crimes" and that "[t]his violates the Constitutional rights of persons convicted under the more serious of the two offenses." <u>St. Helen v. Senkowski</u>, No. 02 Civ. 10248, 2003 U.S. Dist. LEXIS 26642, at *10 (S.D.N.Y. Sept. 19, 2003), <u>rev'd on other grounds</u>, 374 F.3d 181 (2d Cir. 2004).

Judge Brieant also granted a habeas petition in one other case based on his conclusion that New York's depraved indifference murder statute is unconstitutionally vague as it is applied. <u>See</u> <u>Jones v. Keane</u>, No. 7:02-CV-01804-CLB, 2002 WL 33985141, at *5 (S.D.N.Y. May 22, 2002) (Brieant, J.),

rev'd on other grounds 329 F.3d 290 (2d Cir. 2003). Finally, in a third case, Judge Brieant granted a habeas petition on the ground that the evidence of the defendant's "depraved indifference" was constitutionally infirm because the only reasonable conclusion based on the evidence was that the defendant acted with the intent to kill, and not recklessly. See DiSimone v. Phillips, No. 04 Civ. 3128(CLB), 2005 WL 5396451, at *5 (S.D.N.Y. Nov. 30, 2005) (Brieant, J.). The DiSimone case is currently on appeal to the Second Circuit. Insofar as the Court can discern, Judge Brieant ruled only as to the sufficiency of the evidence against the defendant, and not the constitutionality of the depraved indifference statute. Id.

Under New York law, a person is guilty of manslaughter in the second degree when he or she "recklessly causes the death of another person." N.Y. Penal Law § 125.15(1). The definition of "reckless" is provided in a separate statute in the Penal Law. A person acts recklessly:

> when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

N.Y. Penal Law § 15.05(3).

A person is guilty of murder in the second degree when, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly

57

engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."  N.Y. Penal Law § 125.25(2).

Relying on Judge Brieant's decision in St. Helen, No. 02 Civ. 10248, 2003 U.S. Dist. LEXIS 26642 (S.D.N.Y. Sept. 19, 2003), the petitioner argues that there is effectively no workable distinction between these two statutes and, therefore, the statutory definition of depraved indifference second degree murder is unconstitutionally vague.  According to the petitioner, the constitutional problem is that the statute inadequately defines the more serious degree of recklessness so that prosecutors and juries can only determine which crime to prosecute or apply to any particular set of facts in an arbitrary or erratic manner.

In 1972, the New York State Court of Appeals held that the New York depraved indifference statute under which Rustici was convicted was not unconstitutionally vague.  See People v. Poplis, 30 N.Y.2d 85, 88, 281 N.E.2d 167, 168, 330 N.Y.S.2d 365, 366 (1972) ("The murder definition requires conduct with 'depraved indifference' to 'human life,' plus recklessness.  This is conduct of graver culpability, and it is the kind which has been rather well understood at common law to involve something more serious than mere recklessness alone which has had an incidental tragic result.").

In 1995, the New York Court of Appeals reached the same conclusion with respect to a different section of the second degree murder statute.

See People v. Cole, 85 N.Y.2d 990, 993, 652 N.E.2d 912, 913, 629 N.Y.S.2d 166, 167 (1995).  New York Penal Law section 125.25 has five subsections.  Similar to subsection (2), subsection (4) also requires "circumstances evincing a depraved indifference to human life" and "conduct which creates a grave risk."  Penal Law section 125.25(4) provides, in its entirety, that a person is guilty of murder in the second degree when:

> Under circumstances evincing a depraved indifference to human life, and being eighteen years old or more the defendant recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person.

N.Y. Penal Law § 125(4).  In Cole, the New York Court of Appeals ruled that "the fact that the statute [§ 125(4)] encompasses conduct 'which creates a grave risk of serious injury or death' . . . does not render the statute unconstitutionally vague, since the type and level of risks to be avoided by the actor are specifically delineated."  Cole, 85 N.Y.2d at 992.

In 1996, the New York Court of Appeals spoke on the subject again, also rejecting a void-for-vagueness challenge to the depraved indifference murder statute, Penal Law section 125.25(2).  See People v. Johnson, 87 N.Y.2d 357, 360, 639 N.Y.S.2d 776, 777, 662 N.E.2d 1066, 1067 (1996) (citing Cole, 85 N.Y.2d 990, 652 N.E.2d 912).

After <u>Cole</u> and <u>Johnson</u> were decided, numerous New York appellate court cases and most of the federal district court cases have explicitly and repeatedly rejected vagueness challenges to the depraved indifference statute. <u>See</u> <u>People v. Petronio</u>, 34 A.D.3d 602, 603, 825 N.Y.S.2d 99, 100 (2d Dep't 2006) ("The defendant's argument that the Court of Appeals' formulation of depraved indifference murder is unconstitutionally vague is unpreserved for appellate review . . . and, in any event, is without merit."); <u>People v. Riddick</u>, 34 A.D.3d 923, 925, 823 N.Y.S.2d 594, 596 (3d Dep't 2006) ("[W]e find no merit to defendant's present claim that the depraved indifference murder statute is unconstitutionally vague because no rational jury could logically distinguish between it and manslaughter in the second degree."); <u>People v. Brown</u>, 23 A.D.3d 1090, 1092, 804 N.Y.S.2d 209, 210 (4th Dep't 2005) ("[C]ontrary to defendant's contention, the depraved indifference murder statute is not unconstitutionally vague."); <u>People v. Reyes</u>, 4 A.D.3d 541, 541, 771 N.Y.S.2d 706, 707 (2d Dep't 2004) ("The defendant's contention that Penal Law § 125.25(2) is unconstitutionally vague was not preserved for appellate review.  In any event, the contention is without merit.") (citation omitted); <u>People v. Joyner</u>, 303 A.D.2d 421, 421, 755 N.Y.S.2d 866, 867 (2d Dep't 2003) ("The defendant's contention that Penal Law § 125.25(2) is unconstitutionally vague is without merit.") (citations omitted); <u>People v. Mannix</u>, 302 A.D.2d 297, 297, 756 N.Y.S.2d 33, 34

(1st Dep't 2003) ("Contrary to defendant's contention, Penal Law § 125.25(2), which defines 'depraved indifference' murder, is not unconstitutionally vague."); see also Farr v. Greiner, Nos. 01 CR 6921 (NG)(MDG), 01-CV-6921 (NG)(MDG), 2007 WL 1094160, at *29 (E.D.N.Y. Apr. 10, 2007) ("Even if petitioner were correct that there is no discernible distinction between depraved indifference murder and the lesser included offense of reckless manslaughter, there is no constitutional violation entitling him to habeas relief."); Guzman v. Greene, 425 F. Supp. 2d 298, 320 (E.D.N.Y. 2006) ("Guzman's claim based on his counsel's failure to argue that the depraved indifference statute was unconstitutionally vague is similarly without merit.  Courts have repeatedly upheld the constitutionality of the statute."); Mannix v. Phillips, 390 F. Supp. 2d 280, 292 (S.D.N.Y. 2005) (rejecting claims similar to the petitioner's and holding that the deliberate indifference murder statute is not unconstitutionally vague).

It appears that the only judge to ever hold that the New York depraved indifference statute is unconstitutional is Judge Brieant of the Southern District of New York.  See St. Helen v. Senkowski, No. 02 Civ. 10248, 2003 U.S. Dist. LEXIS 26642, at **9-10 (S.D.N.Y. Sept. 19, 2003), rev'd on other grounds St. Helen v. Senkowski, 374 F.3d 181 (2d Cir. 2004); Jones v. Keane, No. 7:02-CV-01804-CLB, 2002 WL 33985141 (S.D.N.Y. May 22, 2002), rev'd on other grounds 329 F.3d 290 (2d Cir. 2003).  In Jones, Judge Brieant stated that "[a]

rational jury could not be expected to differentiate between a 'grave risk of death' and a 'substantial risk of death,' as required by the New York Court of Appeals. This is a distinction without a difference." Jones, 2002 WL 33985141, at *5.

Just two months after Judge Brieant issued Jones in May 2002, Judge Rosenblatt of the New York Court of Appeals authored a dissenting opinion in agreement with Judge Brieant and citing Jones in a footnote. See People v. Sanchez, 98 N.Y.2d 373, 406-07 & n.18, 777 N.E.2d 204, 748 N.Y.S.2d 312 (2002) (Rosenblatt, J., dissenting) ("To the extent that it endorses Register, the majority also conflates depraved indifference murder with reckless manslaughter. After today, depraved indifference murder can thus be used as a proxy for not one but two separate crimes.").

Prior to Judge Rosenblatt's dissent in Sanchez, two earlier New York Court of Appeals Judges wrote dissenting opinions criticizing the depraved indifference murder statute in relation to manslaughter. See People v. Roe, 74 N.Y.2d 20, 29, 542 N.E.2d 610, 544 N.Y.S.2d 297 (1989) (Bellacosa, J., dissenting) ("[T]his result finalizes the obliteration of the classical demarcation between murder and manslaughter in this State."); People v. Register, 60 N.Y.2d 270, 285, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983) (Jasen, J., dissenting) ("While there may be a technical distinction between a 'grave' risk and a 'substantial' one, the only real difference is about 15 years in prison.").  It is noted, however, that in

each these three dissenting opinions the Judges stopped short of invalidating the depraved indifference statute.  Each of these Judges would have held, as the Court of Appeals later did in <u>People v. Feingold</u>, 7 N.Y.3d 288, 852 N.E.2d 1163, that "depraved indifference" should be construed as the required mental state rather than recklessness.

The Second Circuit reversed both the <u>St. Helen</u> and the <u>Jones</u> cases because the petitioner raised his vagueness argument for the first time in his motion for leave to appeal to the New York Court of Appeals.  "Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it."  <u>Lurie v. Wittner</u>, 228 F.3d 113, 124 (2d Cir. 2000) (citing <u>Castille v. Peoples</u>,  489 U.S. 346, 351, 109 S. Ct. 1056, 1060 (1989)); <u>see also</u> <u>St. Helen v. Senkowski</u>, 374 F.3d 181, 183 (2d Cir. 2004) (same).  Thus, St. Helen's and Jones' vagueness challenges were found to be procedurally barred.

This Court, in keeping with weight of the federal and state cases that have previously addressed the question, holds that New York's depraved indifference murder statute is not unconstitutionally vague and does not allow unlimited or arbitrary discretion in its application.  <u>See</u> <u>Farr</u>, 2007 WL 1094160, at 21-24; <u>Guzman</u>, 425 F. Supp. 2d at 313; <u>Mannix</u>, 390 F. Supp. 2d at 292; <u>Johnson</u>, 87 N.Y.2d at 361; <u>Cole</u>, 85 N.Y.2d at 992; <u>Poplis</u>, 30 N.Y.2d at 89; <u>Petronio</u>, 34

A.D.3d at 603, 825 N.Y.S.2d 99; Riddick, 34 A.D.3d at 924, 823 N.Y.S.2d 594; Brown, 23 A.D.3d at 1092, 804 N.Y.S.2d 209; Reyes, 4 A.D.3d 541, 771 N.Y.S.2d 706; Joyner, 303 A.D.2d 421, 755 N.Y.S.2d 866; Mannix, 302 A.D.2d 297, 756 N.Y.S.2d 33.  Accordingly, the petition for habeas relief on the ground of the unconstitutionality of New York's depraved indifference statute is denied.

### 6.    As to the Petitioner's Remaining Claims

In addition to those grounds for relief specifically enumerated in the petition, the petitioner also included several additional arguments in his briefs submitted in support of his application.

### a.    Sufficiency of the Evidence

In affirming the petitioner's  conviction, the Appellate Division stated that "[t]he defendant's contention that the evidence was legally insufficient is unpreserved for appellate review. " People v. Rustici, 303 A.D.2d 606, 756 N.Y.S.2d 498 (2d Dep't 2003).  Procedural waiver under state law "constitutes an independent and adequate state ground that bars federal consideration of the substantive claim on habeas corpus."  See Gonzalez v. Sullivan, 934 F.2d 419, 421 (2d Cir. 1991).  The petitioner did not show "cause and prejudice" for his default and, thus, the claim is procedurally barred.

However, to complete the record, on the merits, the claim is denied.  The petitioner argues that "[a] review of the trial transcript would reveal that there was

an insufficient quantum of evidence to support Mr. Rustici's conviction on" the charge of Second Degree Murder on a theory of depraved indifference to human life.  As with other grounds for relief raised in this petition, a petitioner who challenges the sufficiency of the evidence supporting his conviction "bears a heavy burden."  United States v. Griffith, 284 F.3d 338, 348 (2d Cir. 2002) (citing United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001)).  To obtain habeas corpus relief, the Court must find that, when viewing the evidence most favorably to the prosecution, no rational trier of fact could find guilt beyond a reasonable doubt.  Farrington v. Senkowski, 214 F.3d 237, 240-41 (2d Cir. 2000) (citing Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

In addition, the Court must defer to the jury's determination of the weight given to conflicting evidence, witness credibility, and inferences drawn from the evidence.  United States v. Vasquez, 267 F.3d 79, 90-91 (2d Cir. 2001) (citing Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 86 L. Ed. 680 (1942); United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998)).  A guilty verdict may not be disturbed if the jury has resolved these issues in a reasonable manner.  See id.  The Court's "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  Herrera v. Collins, 506 U.S. 390, 402, 113 S. Ct. 853, 861, 122 L. Ed. 2d 203 (1993).  A federal habeas court must "credit every

inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988).

Applying the above standard, the Court finds that the evidence amply supports the petitioner's Second Degree Murder conviction. As stated above, under New York law, a defendant is guilty of murder in the second degree when "under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal § 125.25(2). At the time of the trial and when the petitioner's conviction became final, recklessness was the culpable mental state for depraved indifference murder. The depravity and indifference of the crime was assessed objectively based on a review of the circumstances constituting the offense. See People v. Sanchez, 98 N.Y.2d 373, 381-82, 777 N.E.2d 204, 748 N.Y.S.2d 312 (2002), overruled by People v. Feingold, 7 N.Y.3d 288, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006); People v. Register, 60 N.Y.2d 270, 274, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983), overruled by People v. Feingold, 7 N.Y.3d 288, 852 N.E.2d 1163.

By his own admission, the petitioner went to Behr's house; took a loaded gun from Bertolini's car; approached Behr while running with his finger on the trigger of the loaded gun; and left Behr lying there injured and bleeding without

attempting to render aid and without knowing whether he was alive or dead.

Even assuming the jury credited the petitioner's version of the events and

believed that the gun discharged accidentally, the jury could reasonably conclude

that the petitioner's conduct was extremely reckless, and evinced indifference not

only for the life of the victim, but for others in the neighborhood, and created a

grave risk of death for Behr and anyone else who happened to be present when

the gun "accidentally" discharged.  This would have been sufficient at the time of

the trial to convict the petitioner for depraved indifference murder.  See People v.

Melendez, 11 A.D.3d 983, 782 N.Y.S.2d 893, 895 (4th Dep't 2004); People v.

Cunningham, 222 A.D.2d 727, 730, 635 N.Y.S.2d 304, 309 (3d Dep't 1995);

People v. Rosario, 208 A.D.2d 961-62, 617 N.Y.S.2d 887 (2d Dep't 1994);

People v. Haley, 195 A.D.2d 873, 873-74, 600 N.Y.S.2d 842 (3d Dep't 1993);

People v. Rammelkamp, 167 A.D.2d 560, 561, 562 N.Y.S.2d 231 (2d Dep't

1990).

On the other hand, the jury was free to reject Rustici's version of an

accidental discharge of the gun and believe that, although he purposefully shot

Behr, the petitioner did not intend to cause his death.  This also was sufficient to

convict him of depraved indifference murder.  See People v. Sanchez, 98 N.Y.2d

373, 777 N.E.2d 204, 748 N.Y.S.2d 312 (2002), overruled by People v. Feingold,

7 N.Y.3d 288, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006); People v. Fenner, 61

N.Y.2d 971, 973, 463 N.E.2d 617, 475 N.Y.S.2d 276 (1984); People v. Register, 60 N.Y.2d 270, 278, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983), overruled by People v. Feingold, 7 N.Y.3d 288, 852 N.E.2d 1163.

In Sanchez, the New York Court of Appeals upheld a conviction for depraved indifference murder when the defendant fired a gun pointed at the victim's chest from a distance of twelve to eighteen inches and then fled. 98 N.Y.2d at 375-76. In Register, the proof was that the defendant entered a crowded barroom with a pistol, drank for several hours stating that he was " 'going to kill somebody tonight,' or similar words," then later shot at close range a person who had been arguing with his friend; shot a second person by mistake; and shot a third person for no explained reason. Register, 60 N.Y.2d at 273-75.

The law as stated in Register and Sanchez was controlling at the time of the petitioner's conviction in 2000, and the Court finds that the evidence was sufficient under New York law at that time to convict the petitioner for depraved indifference murder. See Guzman v. Greene, 425 F. Supp. 2d 298, 313 (E.D.N.Y. 2006); see also People v. Danielson, 40 A.D.3d 174, 832 N.Y.S.2d 546, 548 (1st Dep't 2007) (finding the defendant's insufficiency of the evidence unpreserved for appellate review, but stating that at the time of the conviction in 2001, the jury could reasonably have found depraved indifference murder where the facts

established that the defendant was one of three shooters who shot the deceased victim eleven times). Thus, the petitioner has not demonstrated that the Court should disturb the jury's verdict, or that the State Court's decision was an unreasonable application of federal law.

In reaching this conclusion, the Court recognizes that there have been significant developments in New York regarding the law of depraved indifference murder and the legal sufficiency of evidence supporting such a claim. See, e.g., Feingold, 7 N.Y.3d 288, 852 N.E.2d 1163, 819 N.Y.S.2d 691 (2006). Feingold involved a prosecution for the offense of first degree reckless endangerment, which is "recklessly" engaging in conduct which creates a "grave risk of death" to another person "under circumstances evincing a depraved indifference to human life." N.Y. Penal Law § 120.25. Even though Feingold involved only reckless endangerment and not a homicide, because the term "depraved indifference" has the same meaning under the murder and reckless endangerment statutes the New York Court of Appeals reexamined its depraved indifference jurisprudence, including Register and Sanchez. Feingold, 7 N.Y.3d at 290-94.

In Feingold, that Court of Appeals recognized that beginning in the year 2003, several cases began restricting the circumstances under which a defendant could be found guilty of depraved indifference murder. Id. at 292 (citing People v. Hafeez, 792 N.E.2d 1060, 762 N.Y.S.2d 572 (2003); People v. Gonzalez, 1

N.Y.3d 464, 807 N.E.2d 273, 775 N.Y.S.2d 224 (2004); <u>People v. Payne</u>, 3

N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004); <u>People v. Suarez</u>, 6

N.Y.3d 202, 844 N.E.2d 721, 811 N.Y.S.2d 267, 274 (2005)).  Notably, in <u>Suarez</u>,

the Court of Appeals stated:

> [S]omeone who intends to cause serious physical injury does not commit depraved indifference murder because the intended victim dies. . . .  Thus, one who acts with the conscious intent to cause serious injury, and who succeeds in doing so, is guilty only of manslaughter in the first degree.  Otherwise, every intentional manslaughter would also establish depraved indifference murder—a result plainly at odds with the discrete classifications set forth in the statute.  Since a defendant who intends to injure or kill a particular person cannot generally be said to be "indifferent"—depravedly or otherwise—to the fate of that person, we underscore what we said in <u>Payne</u>: "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder."

6 N.Y.3d at 211-12, 844 N.E.2d at 728, 811 N.Y.S.2d at 274.

Before <u>Feingold</u>, recklessness was the required mental state for depraved

indifference murder and the depravity and indifference was assessed objectively

based on a review of the circumstances of the crime.  <u>See</u> <u>People v. Sanchez</u>, 98

N.Y.2d 373, 381-82, 777 N.E.2d 204, 748 N.Y.S.2d 312 (2002); <u>People v.</u>

<u>Register</u>, 60 N.Y.2d 270, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983).

Recognizing an erosion of that rule, in <u>Feingold</u> the Court of Appeals explicitly

overruled <u>Sanchez</u> and <u>Register</u>, and held that "depraved indifference is a

culpable mental state."  <u>Feingold</u>, 7 N.Y.3d at 294.

A recent example of the effect of this change in the law, and the new restrictive application of the depraved indifference statute, can be found in the case of <u>People v. Casper</u>, --- N.Y.S.2d ----, 2007 WL 1953690 (4th Dep't July 6, 2007). In <u>People v. Casper</u>, "[t]he evidence presented at trial established that defendant caused the death of his wife by causing or allowing the van in which she was a passenger to go over a cliff." <u>Id.</u> at *1. The jury acquitted the defendant of intentional murder, but found him guilty of second degree murder under a theory of depraved indifference. In a case that, with reasonable certainty, would have been affirmed under <u>Sanchez</u> and <u>Register</u>, the Appellate Division, Fourth Department reduced the conviction to reckless manslaughter. In the view of the Appellate Division, "the evidence [did] not warrant a finding that the defendant's conduct was 'marked by uncommon brutality' 'or any other hallmarks of wanton recklessness necessary to demonstrate 'circumstances evincing a depraved indifference to human life.' " <u>Id.</u> (quoting <u>People v. Payne</u>, 3 N.Y.3d 266, 819 N.E.2d 634, 786 N.Y.S.2d 116 (2004)) (additional citation omitted). The Court concluded that the defendant's conduct did not "fall within the small, and finite, category of cases evincing utter depravity, uncommon brutality and inhuman cruelty required for depraved indifference murder." <u>Id.</u> (citation omitted).

Also, the Court notes the ruling of the New York Court of Appeals in

People v. Atkinson, 7 N.Y.3d 765, 853 N.E.2d 227, 819 N.Y.S.2d 858 (2006).  In

Atkinson, the defendant was convicted of depraved indifference murder where

"the evidence established that the defendant fired a shot directly at the deceased

from very close range, striking him in the neck, and then walked away."  21

A.D.3d at 155-56, 799 N.Y.S.2d at 135.  On July 18, 2005, the Appellate

Division, Second Department, affirmed the conviction, stating that

> The jury concluded that, although the defendant did not harbor the
> conscious objective of killing the deceased, he committed a reckless
> act that was imminently dangerous to the deceased and created a very
> high risk that he would die, and was so wanton, so deficient in a
> moral sense of concern, so devoid of regard for the deceased's life,
> and so blameworthy as to warrant the same criminal liability as
> would be imposed if the defendant had killed the deceased
> intentionally. We cannot conclude that the evidence was legally
> insufficient to support that finding.

Id. (citations omitted).  In July, 2006, the New York Court of Appeals reduced

Atkinson's conviction to manslaughter, finding that he did not commit depraved

indifference murder within the meaning of the statute.  People v. Atkinson, 7

N.Y.3d 765, 853 N.E.2d 227, 819 N.Y.S.2d 858 (2006).

However, even if these recent cases would have resulted in a different

outcome for the petitioner if he were tried for depraved indifference murder

today, this Court looks to the law as it was at the time that the petitioner was

convicted, which was the year 2000.  The Appellate Division, Second Department

affirmed the conviction on March 17, 2003, and the Court of Appeals denied leave to appeal on July 10, 2003. The law regarding depraved indifference murder did not begin its shift until People v. Hafeez, 792 N.E.2d 1060, 762 N.Y.S.2d 572, was decided on June 10, 2003. The holdings culminating in the Feinberg decision are not to be applied retroactively and may not be used as a basis for granting the habeas relief the petitioner requests. See Policano v. Herbert, 7 N.Y.3d 588, 589, 603, 859 N.E.2d 484, 825 N.Y.S.2d 678 (2006).

In Policano, answering three certified questions from the Second Circuit, the New York Court of Appeals held that the recent developments in the law post-Sanchez restricting the circumstances that could support a finding of depraved indifference do not apply retroactively. Id. at 603.

The first certified question was whether a defendant could be convicted of depraved indifference murder if the evidence at the trial indicated that the defendant harbored "the conscious objective of killing the victim." This question is not relevant here.

The second certified question was "[a]t the time Policano's conviction became final [in 2001], what were the established elements of depraved indifference murder?" Id. at 602. The New York Court of Appeals responded that

> at the time the defendant's conviction became final, the People were
> required to prove that defendant (1) recklessly engaged in conduct

> (2) which created a grave risk of death to another person (3) thereby causing the death of another person (4) under circumstances evincing a depraved indifference to human life. The <u>mens rea</u> of depraved indifference murder was recklessness and, as we held in <u>Register</u>, "under circumstances evincing a depraved indifference to human life" defined the factual setting, viewed objectively, in which the risk-creating conduct occurred.

<u>Id.</u>

Certified question number three was whether "the interpretation of N.Y. Penal Law § 125.25 (1) and (2) set forth in <u>People v. Payne</u>, . . . and <u>People v. Gonzalez</u>, . . . state the correct interpretation of the law of New York with respect to the elements of depraved indifference murder on the date Policano's conviction became final?" <u>Id.</u> The New York Court of Appeal interpreted this question as raising the issue of whether "our post-<u>Sanchez</u> case law applies retroactively to defendant's case[.] . . . We conclude that it does not." <u>Id.</u> at 603.

Federal district courts ruling on petitions for habeas corpus recognize and apply <u>Policano</u>'s rule of non-retroactivity. See <u>Lavayen v. Duncan</u>, No. 02 CV 0305(NG)(LB), 2007 WL 1695585, at *10 (E.D.N.Y. Jun 7, 2007); <u>Cruz v. Conway</u>, No. 05 CV 4750(ARR), 2007 WL 1651855, *3 (E.D.N.Y. June 6, 2007); <u>Nicholas v. Smith</u>, No. 02 CV 6411(ARR), 2007 WL 1213417, *6 (E.D.N.Y. Apr. 20, 2007); <u>Farr v. Greiner</u>, 2007 WL 1094160, at **21-24. The Court also notes that although the convictions in the <u>Casper</u> and <u>Atkinson</u> cases, discussed above, were in the years 2000 and 2002, respectively, the decisions in

those cases reducing the convictions from depraved indifference murder to manslaughter were not rendered until a much later date. The Appellate Division reduced Casper's conviction in 2007. The New York Court of Appeals reduced Atkinson's conviction in 2006. Significantly, both the Appellate Division in Casper and the New York Court of Appeals in Atkinson relied on People v. Payne, which was decided in 2004. In the petitioner's case, all of his state court appeals were exhausted by July 2003, which was one year before Payne was decided. At the time of the petitioner's conviction in 2000, and when his conviction became final in 2003, the facts of this case permitted a jury to find the petitioner's guilt beyond a reasonable doubt for depraved indifference second degree murder. Accordingly, the petition for habeas relief on the ground of insufficient evidence is denied.

### b. Confrontation Clause Violation

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him." Henry v. Speckard, 22 F.3d 1209, 1214 (2d Cir. 1994) (citing Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)); see also Cotto v. Herbert, 331 F.3d 217, 229 (2d Cir. 2003) (citing Davis v. Alaska, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)). "This right, however, may be subject to limitations

imposed by the trial court.  Indeed, 'trial court judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination.' " Lugo v. Edwards, No. 97 Civ. 7789, 1998 WL 601080, at *2 (S.D.N.Y. Sept. 9, 1998) (citing Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed.2d 674 (1986)).  "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985).

"A violation of a defendant's confrontation rights does not, standing alone, require reversal of a judgment of conviction." Cotto, 331 F.3d at 253. "Rather, [a] violation[] of the Confrontation Clause [is] subject to harmless error analysis." Id. (citing Van Arsdall, 475 U.S. at 684, 106 S. Ct. 1431).  Indeed, "where a reviewing court concludes that the trial judge has improperly curtailed cross-examination, the inquiry is 'whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless' " Id. (quoting Van Arsdall, 475 U.S. at 684, 106 S. Ct. 1431).  The reviewing court must make that finding beyond a reasonable doubt. Fuller v. Gorczyk, 273 F.3d 212, 220 (2d Cir. 2001) (citing Van Arsdall, 475 U.S. at 684).  "The burden of persuasion is on the government, meaning that

if 'the matter is so evenly balanced that [the federal judge] feels himself in virtual equipoise as to the harmlessness of the error,' the petitioner should prevail." Cotto, 331 F.3d at 253 (quoting Lainfiesta v. Artuz, 253 F.3d 151, 158 (2d Cir. 2001)) (additional citations omitted).

The petitioner argues that the trial court improperly curtailed the cross-examination of prosecution witness Detective Martin Alger. Specifically, he contends that the trial court should have allowed defense counsel to cross-examine Detective Alger about allegedly inconsistent statements that another prosecution witness, Arturo Givargidze, made to the Nassau County detectives during the course of his interrogation.

> Q.   And during the course of that time period from approximately eleven, 11:30 on November 11th, until two a.m. on the 13th, [Givargidze] gave you different versions of what his recollection was of certain conversations he had had in August of 1997?
>
> A.   If you're talking to myself, he gave different versions to myself, specifically?
>
> Q.   Well to you, or the officers questioning him in your presence.
>
> A.   Yes, to Volpe, Gallo, and myself, yes. There were a couple of stories.
>
> Q.   And would it be your recollection that about six hours after he arrived at the Homicide Squad, he gave a version that you accepted as an accurate version?
>
> A.   That's correct. I believe it was around six a.m. in the morning.

* * *

Q.  And [Givargidze] gave you the version you accepted at around six a.m. on the 12th, many hours before Bertolini arrived; correct?

A.  Yes, sir.

Q.  And did [Givargidze], in the course of telling you the version you accepted after six a.m., did he tell you that he couldn't believe that [the petitioner] was involved in this? His opinion of [the petitioner] was one that he wouldn't be involved in something like this, that he wasn't the type of person that would get himself involved in a murder.  He was shocked by it.  He was surprised by it.

MS. WATSON:     Objection

THE COURT:     Sustained.

MR. LONDON:     May we approach on that?

THE COURT:     Step up.

(Whereupon a discussion was held at the bench, outside the hearing of the jury, and on the record as follows:)

MR. LONDON:     Your Honor, Mr. Carra is going to argue this point.

MR. CARRA:     My understanding, the objection is going to the hearsay to statements comprising what [Givargidze] told Alger.

According to Richardson in 8-205, the first sentence indicates: An adversary witness may be impeached by showing that the witness has made a

statement inconsistent with the witness' testimony on trial.

Since that goes to the heart of the objection here, [Givargidze] was called by the People, who testified under oath to certain facts. [Givargidze] further made statements to Detective Alger, which Detective Alger has previously testified to in the Huntley Hearing.

Detective Alger's recollection of [Givargidze's] statement is completely inconsistent with those statements that [Givargidze] testified to during the course of trial testimony.

MS. WATSON:     In part, though, [Givargidze] was not confronted with alleged inconsistencies to Detective Alger. So therefore he didn't have a chance to explain it. And to just throw it out as an inconsistency, I don't think would be appropriate use.

MR. CARRA:     But it is offered not only for the truth of the matter asserted, but merely to demonstrate that [Givargidze] did make the statement. That is supported by Richardson as well.

It indicates, an inconsistent statement of a witness admitted to affect the witness' credibility, is received simply to show that it was made. The inconsistent statement is not admitted for its truth.

THE COURT:     I don't quarrel with that. But the proper procedure would be on an

inconsistent statement, is to question the person making the statement as to whether or not they made a prior inconsistent statement. And it would be by showing them a document to indicate that on a previous occasion they said something contra to what they are testifying to. The proper person to have asked this would have been Arturo --

MS. WATSON:        Givargidze.

THE COURT:         Arturo, the owner of the Carvel. I can't pronounce his last name.

MR. LONDON:        I did ask him, did you say, in essence what this says.

THE COURT:         If that question were asked, and he answered, no?

MR. LONDON:        He said, no.

THE COURT:         Then in the Court's opinion, it become collateral. You would be estopped from pursuing the path as evidence on a collateral matter. In other words, a prior inconsistent statement, the person making it still is the one that has to be questioned about it.

MR. LONDON:        We're not offering it for the truth.

THE COURT:         It doesn't make any difference.

MR. LONDON:        We're offering it as part of his credibility. He said he never made the statement.

| THE COURT: | That becomes a collateral matter. It affects credibility as to whether or not you're allowed to make, ask someone else, did he make such a statement? You're asking the question of someone entirely different than the person who made the statement, and the alleged inconsistent statement. |

(Tr. at 275-79.)

As stated by the petitioner's trial counsel, the purpose of this questioning was to impeach the credibility of Givargidze by establishing that he made statements to Alger that were inconsistent with his trial testimony. The Court finds that it was within the trial court's discretion to sustain objections to questions asked to Detective Alger regarding inconsistent statements that Givardigze is alleged to have made. See Rosario v. Attorney Gen. of N.Y., No. 00 CIV 6681, 2001 WL 267641, at *10-11 (S.D.N.Y. Mar. 19, 2001) ("Any limitation on cross-examination was within the trial court's discretion.").

On cross-examination Givargidze was not questioned about any allegedly inconsistent statements he made to Detective Algers. Under New York law, in order to impeach Givargidze's credibility with evidence that he made inconsistent statements to Detective Alger, the defendant should have first confronted Givardigze with the inconsistent statements so that he would have an opportunity to explain them. See People v. Duncan, 46 N.Y.2d 74, 80-81, 385 N.E.2d 572, 412 N.Y.S.2d 833 (1978) ("[I]t is necessary that the witness be clearly and fairly

apprised of the statements which may be subject to impeachment. . . .  In order to prevent surprise and give the witness the first opportunity to explain any apparent inconsistency between his testimony at trial and his previous statements, he must first be questioned as to the time, place and substance of the prior statement."); People v. Laurey, 24 A.D.3d 1107, 1109, 807 N.Y.S.2d 437 (3d Dep't 2005) ("County Court properly prohibited defendant from introducing evidence of prior inconsistent statements of prosecution witnesses.  Defendant failed to lay a proper foundation for that testimony by first confronting the prosecution witnesses about the purported inconsistencies between their trial testimony and the prior statements, and then giving them an opportunity to explain any such inconsistencies."); see also People v. Delacruz, 276 A.D.2d 387, 714 N.Y.S.2d 277 (1st Dep't 2000) ("The court properly precluded defendant from recalling a police witness to impeach another witness since defendant failed to lay a sufficient foundation for the testimony.") (citations omitted).

 Detective Alger testified, without objection, that Givargidze told different accounts to the several detectives.  On cross-examination, the petitioner's counsel sought to elicit from Alger additional testimony about what Givargidze told him. To the extent that the petitioner sought to elicit this testimony from Detective Alger to impeach Givargidze's credibility, it was properly excluded because the

record reflects that Givargidze was not questioned about any alleged inconsistent statements to Alger.

Also, the Court finds no inconsistency between the question trial counsel asked Detective Alger and Givargidze's testimony. Defense counsel asked Detective Alger if Givargidze told him "that he couldn't believe that [the petitioner] was involved in this," that the petitioner "wouldn't be involved in something like this," that the petitioner wasn't the type of person that would get himself involved in a murder", and that he was "shocked" and "surprised." On two occasions, once on cross-examination and once on re-direct, Givargidze testified that he had a conversation with Rustici where he told Rustici that he was "surprised," that he "couldn't believe [he] would get involved with something like this," and that he told the police about this conversation. (Tr. at 165, 168).

Finally, the trial court did not preclude the petitioner's counsel from questioning Givargize about his prior statements. The petitioner's trial counsel had a full and fair opportunity to cross-examine Givargidze about these statements when he testified for the prosecution. Thus, the Court finds that trial court acted within its discretion in excluding Alger's testimony and that no Confrontation Clause violation occurred. See Thompson v. Burge, No. 05-CV-2914 (JFB), 2007 WL 2020185, at *10 n.6 (E.D.N.Y. July 6, 2007) (finding that the petitioner's confrontation rights were not implicated because the

"[p]etitioner's counsel was fully able to confront and cross-examine the two victims who testified at trial."); Lugo v. Edwards, No. 97 Civ. 7789 DC, 1998 WL 601080, at *6 (S.D.N.Y. Sept. 9, 1998) ("[I]f a defendant has 'ample opportunity to conduct effective cross examination,' there will be no violation of the Confrontation Clause.") (citations omitted). Accordingly, the petition for habeas relief based on a Sixth Amendment violation is denied.

### D.      As to a Certificate of Appealability

Rule 22(b) of the Federal Rules of Appellate Procedure provides that "[i]n a habeas corpus proceeding in which the detention complained of arises from process issued by a state court . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."

Section 2253(c) provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" does not require that a petitioner demonstrate that he would prevail on the merits in his appeal, but only that the issues he raises are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. See Miller-El v. Cockrell, 537 U.S. 332, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003), Barefoot v. Estelle, 463 U.S.

880, 893 n.4, 103 S. Ct. 3383, 3395, 77 L. Ed. 2d 1090 (1983); <u>Lucidore v. N.Y.</u>

<u>State Div. of Parole</u>, 209 F.3d 107, 112 (2d Cir. 2000).

In the Court's view, the petitioner has satisfied his burden for a certificate

of appealability with regard to the issue of whether New York's depraved

indifference murder statute is unconstitutionally vague.  This question is

debatable among jurists of reason, as evidenced by the dissents of former Court of

Appeals Judges Jasen, Bellacosa, and Rosenblatt, and the opinions of Judge

Brieant in the Southern District of New York.

Also, the question is one which should receive further review.  The

Second Circuit has not yet addressed whether New York's depraved indifference

murder statute, on its face or as interpreted, violates the Constitution.  On two

occasions, the Court found that the question was not properly exhausted and

procedurally barred, and the petitioners failed to show either "cause and

prejudice" or that they were actually innocent.  <u>See</u> <u>St. Helen v. Senkowski</u>, 374

F.3d 181 (2d Cir. 2004); <u>Jones v. Keane</u>, 329 F.3d 290 (2d Cir. 2003).

In <u>DiSimone v. Phillips</u>, No. 04 Civ. 3128, 2005 WL 5396451 (S.D.N.Y.

Nov. 30, 2005), presently on appeal, it is not clear whether the Second Circuit

will have the opportunity to decide the question.  The District Court's decision in

that case appears to rest solely on the ground that the evidence in the case

supported only a finding of intent to kill, and was thus insufficient to convict the

petitioner of depraved indifference murder. 2005 WL 5396451, at *5. Although

"sufficiency of the evidence" claims may sometimes overlap with vagueness

arguments, see Jones, 329 F.3d at 296 (citing Strogov v. Attorney Gen. of N.Y.,

191 F.3d 188, 192 (2d Cir. 1999)), that does not seem to be the case in DiSimone.

## III.  CONCLUSION

For the reasons stated above, Christopher Rustici's petition for a writ of

habeas corpus is denied in all respects. Pursuant to Rule 22(b) of the Federal

Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), the Court grants the

petitioner a certificate of appealability regarding the issue of the Constitutionality

of New York's depraved indifference murder statute, N.Y. Penal Law

§ 125.25(2), as the petitioner has made an alleged substantial showing of a denial

of a constitutional right. See Miller-El v. Cockrell, 537 U.S. 332, 336, 123 S. Ct.

1029, 154 L. Ed. 2d 931 (2003); Barefoot v. Estelle, 463 U.S. 880, 893 n.4, 103 S.

Ct. 3383, 3395, 77 L. Ed. 2d 1090 (1983); Lucidore v. N.Y. State Div. of Parole,

209 F.3d 107, 112 (2d Cir. 2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
      August 3, 2007

        _/s/ Arthur D. Spatt_
        ARTHUR D. SPATT
      United States District Judge